841 A.2d 372

**Robert Angel PEREZ, Jr.**

v.

**STATE of Maryland.**

**No. 1139, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Feb. 3, 2004.

2

4

George Harper, Upper Marlboro, for Appellant.

Ann Bosse, Rachel M. Kamins (Joseph J. Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

MURPHY, C.J., DAVIS, HOLLANDER, SALMON, JAMES R. EYLER, SONNER, KENNEY, DEBORAH S. EYLER, ADKINS, KRAUSER, BARBERA, GREENE,* SHARER, RAYMOND G. THIEME, Jr., (Retired, Specially Assigned) and WILLIAM W. WENNER, (Retired, Specially Assigned), JJ.

JAMES R. EYLER, Judge.

Robert Angel Perez, Jr., appellant (hereinafter Perez or appellant), was convicted by a jury in the Circuit Court for Prince George's County of two counts of felony murder and related charges. Appellant challenges his convictions on several grounds, including an assertion that his statements should have been suppressed because they were involuntary. One of the factors relevant to voluntariness was a delay in presentment to a district court commissioner. In light of recent Court of Appeals decisions dealing with a delay in presentment, we shall vacate appellant's convictions and remand to the circuit court for new pre-trial proceedings and a new trial. We shall also consider (1) the court's refusal to instruct the jury, pursuant to Md. Rule 4–212, that the police are obligated to take persons accused of a crime to a district court commissioner "without unnecessary delay and in no event later than 24 hours after arrest," and (2) the trial court's exclusion of testimony with respect to statements made by one of the two victims, shortly before she died.

---

* Greene, J., now a member of the Court of Appeals, participated in the conference and decision of this case while a member of this Court; and participated in the adoption of this opinion as a member of this Court by special designation.

## FACTS AND LEGAL PROCEEDINGS

### The Murders

On September 15, 1999, veterinarian Nirwan Tharpar and his wife, Shashi Tharpar, were brutally murdered at their animal hospital in Bladensburg, Maryland. An equipment technician found Dr. Tharpar lying behind the reception counter. When police arrived, they discovered that Dr. Tharpar was dead from gunshot wounds. His throat was also slit. They also discovered Mrs. Tharpar on the floor nearby. Though she had been hit in the back of her head and shot at close range over both eyes and in her neck, she was still alive. She described a single assailant—a tall black male. She died shortly after arriving at the hospital.

On August 7, 2000, Keith Mahar informed Prince George's County Detective Joseph Hoffman that Perez and Thomas Gordon had admitted to killing the Tharpars while they robbed the hospital. The next day, on August 8, Hoffman applied for and obtained an arrest warrant for Perez, alleging that probable cause arose from

> information [that] was received by Prince George's County Police Detectives that a witness had knowledge of the persons responsible for these homicides. This witness was interviewed at which time he stated that [Perez] and co-defendant admitted that they had committed an armed robbery of an Animal Hospital in Bladensburg during which time both victims were killed.

Shortly after midnight on August 9, 2000, police officers arrested Perez and took him to the homicide unit of the Prince George's County Criminal Investigation Division ("CID"), where he arrived at 12:31 a.m.

### Perez's Statements

The State's case against Perez included statements that he made to Prince George's County homicide detectives during the approximately 48 hours after he was arrested, but before he was presented to a district court commissioner.

According to the evidence considered in a light most favorable to the State, here is what happened during that time.[1]

Perez was taken to an interrogation room in the homicide unit of CID.

At approximately 1:00 a.m. on August 9, Detective Hoffman and Detective Robert Turner entered the room. Hoffman reviewed *Miranda*[2] rights with Perez. Perez indicated that he understood his rights and did not want an attorney, and he executed a waiver form.

For about forty minutes, Hoffman and Turner interviewed Perez "about his personal information, his associates, his friends, background stuff, school, family, jobs, and things of that nature." At some point, they talked "about a murder involving him and Thomas Gordon." Perez denied any involvement in the murder.

The officers left Perez alone in the room for about 45 minutes while they conferred with other detectives about the status of the investigation. At 2:25 a.m., Hoffman and Turner reentered the room and interviewed Perez for another 80 minutes. At some point, although they had not yet talked to Gordon, the detectives told Perez that Gordon said Perez was the shooter in the incident. Perez continued to deny any involvement. The detectives gave Perez water and left him alone between 3:45 and 4:00 a.m., while they conferred with other detectives about progress in the investigation, including "what was going on in the interview."

Turner resumed the interrogation from 4:40 until 5:50 a.m., with a bathroom break at Perez's request. Prior to this point

---

**1.** We review the suppression record in the light most favorable to the State, as the prevailing party on Perez's motions to suppress, and defer to the suppression court's determination of first-level facts. *See Dashiell v. State,* 374 Md. 85, 93, 821 A.2d 372 (2003). But, the ultimate conclusion of whether a custodial statement is voluntary is one we must make by applying the law to the facts found in that record. *See id.* at 93–94, 821 A.2d 372.

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

in time, Perez admitted knowing Gordon but denied any involvement in the murders, denied owning or firing a gun, and denied that he had ever seen Gordon with a gun.

During this interview, however, Perez admitted that he had seen Gordon fire a gun twice. Perez also admitted that he was under investigation for some breaking and enterings. But, he continued to deny any involvement in the murders.

Perez was again left alone in the interrogation room. At 7:25 a.m., Detective Nelson Rhone, a member of the CID, found Perez "asleep leaning over a table[.]" He "had to shake him to wake him up." Perez was not handcuffed at this time, or at any time, while in the room.

After waking Perez, Rhone introduced himself and gave Perez "a little time to get himself together[.]" He then went over some biographical information.

At 9:15 a.m., Rhone and Perez completed another *Miranda* advisement and waiver. Perez was given some water and a break for the bathroom.

Rhone then questioned Perez about the murders. Perez admitted knowing Gordon, that "they had done several different B and E's in ... Bowie," and that he knew Gordon had a gun, but he claimed he had never seen Gordon with it.

"Later on," however, Perez described "one time" in which he and Gordon were "just driving" in Perez's black Mustang. Gordon "said he needed some money, and they talked about stopping somebody on the side of the road, robbing him." But they could not find anybody, and Gordon "pointed out a spot, and said ... let's go into that one and rob that place." Gordon told Perez to go inside. Perez "knew he was inside of a[n] animal hospital because the lobby had pictures of dogs and cats[.]" He stayed "two to three minutes," and saw only one "white lady," about 40 to 50 years old. Returning to the car, he "[t]old Thomas Gordon no police were near" and "[d]escribed ... what was inside." After parking the car at another location, "[b]oth went in." Perez "[s]aid he heard some shots and then ran out." "[H]e didn't stay ... more

than a brief second" before "jumping in his car." "All of a sudden Thomas Gordon comes running out[.]" They drove "straight to Bowie." When Rhone "asked him to reduce his oral statement into writing, . . . that's what he did."

At 12:07 p.m., Rhone provided Perez with a form to write down this statement. Perez wrote six lines, and then Rhone recorded written questions and answers. The statement was completed about 2:00 p.m. At about 2:20, "[s]omeone brought some [fast] food[.]"

Another break ensued. Detective Hoffman, who had gone home to sleep, returned to the station and learned about Perez's statement. At 2:58 p.m., Hoffman reentered the interrogation room, again reviewed *Miranda* rights, and Perez executed a waiver. Perez then stated that he was present during the robbery and the shooting and that "he went inside to check the place out." "He heard [Gordon] shoot three times[,]" then "fled the scene[.]" Gordon "followed a short time later." Perez wrote a second statement, which was two pages, and then answered follow-up questions and signed written answers. He began the written statement at 3:31 p.m. and completed it at 5:01 p.m. Perez also "drew a map of how the animal hospital is laid out and the general area surrounding the animal hospital[,]" showing "[w]here they parked their car[.]"

At approximately 7:00 p.m., Detective Ismael Canales entered the room and advised Perez of his *Miranda* rights, in preparation for administering a voice stress analysis (lie detector) test that Hoffman asked him to perform. Perez signed a release form stating that he agreed to submit to the test. Canales left the room at 8:10 p.m.

Around midnight on August 10, Detective Hoffman returned to the interrogation room with another *Miranda* waiver and a second type of waiver form. Because Perez had been in custody for almost 24 hours, Hoffman had been advised by a senior investigator that it would be a good idea to ask Perez to waive what he described as his right to be presented to a district court commissioner within 24 hours after arrest. He

brought a waiver statement that he had typed on his word processor.

When Hoffman came in, Perez had his head down on the table, apparently sleeping. At 12:08 a.m., Hoffman reviewed *Miranda* rights, and Perez executed a waiver. At 12:10, Hoffman advised Perez that since he had "been in the custody of the Prince George's County Police for over 23 hours[,]" he had "a right to be presented before a District Court Commissioner within 24 hours[.]" He then asked Perez a series of seven questions, to which Perez responded that he voluntarily agreed to remain at the station for additional questioning; he had not been promised anything, threatened, or coerced into remaining or signing the waiver; he had been advised of his constitutional rights before being questioned; he had not been denied the use of the bathroom or telephone while in custody; and he had not asked for an attorney to be present.

Hoffman reported that Perez "was very cooperative, no problem staying past 24 hours." Perez did not appear tired to Hoffman, who noted that "[h]e had time to sleep at different times." Hoffman then left Perez to sleep.

Based on Perez's statements, police brought Thomas Gordon from an Anne Arundel County detention facility to CID. Rhone explained that this took several hours and required a judge's signature. Beginning at 11:30 p.m., Detective Bergstrom spoke with Gordon about the murders.

Rhone returned on the morning of August 10 to ask Perez again about his involvement in the murders, based on what the police had learned from Gordon and from Perez's voice stress test. According to Rhone, another reason detectives wished to talk again with Perez was that "[t]he autopsy showed that it could not have been ... one person that committed this incident, because one weapon was a knife and one weapon was a gun."

Perez received food in the interrogation room at about 7:15 a.m. At 12:05 p.m., Rhone again advised Perez of his *Miranda* rights. Perez signed another *Miranda* waiver and, at 12:10 p.m., another "commissioner's waiver." He began a

third written statement at 3:07 p.m. because Rhone wanted "to clarify some information that I had gathered from between [the] first interview and now this next one." The statement started as written questions and answers, and then Rhone discussed "the information that [he had] in reference to [how] it couldn't have been just one person[.]"

They "started talking in more depth," and Perez "initially den[ied] that he knew anything about a knife." Perez continued to deny that he had any weapons. At that point, Rhone let Perez hear, via a two-way radio, what Gordon was telling another detective. Gordon said that Perez "was the one that had the knife." "From that point on," Perez admitted having a knife, but said that he gave it to Gordon and did not use any weapon. He also said that Gordon "ran out with a purse, giving him thirty dollars for his share of being involved in the incident." At Rhone's request "to explain the entire situation all over again[,]" Perez did so in writing. He completed the third statement at 4:00 p.m.

During the morning of August 11, Rhone took Perez to the commissioner's office.

Perez was questioned intermittently in an interview room; he was never threatened; never promised anything inappropriate; and never denied food, water, bathroom, rest, or sleep. Perez appeared to be alert throughout the advisements, waivers, and interrogation. He spoke clearly and logically. He never asked for a lawyer. Perez's interrogations were not audiotaped or videotaped because the Prince George's County Police Department lacked the facilities.[3]

For ease of reference, the time line, derived from our review of transcripts and waiver forms, is as follows.

**August 9:**

12:31 a.m.

Appellant arrived at police station.

---

**3.** Perez gave an entirely different account of these two days. As previously indicated, we have presented the evidence in the light most favorable to the prevailing party, the State.

1:03 a.m.

Appellant, after being advised of *Miranda* rights, signed a waiver.

9:15 a.m.

Appellant, after again being advised of *Miranda* rights, signed a waiver.

10:15 a.m.

Appellant gave an oral statement.

12:07–2:00 p.m.

Appellant gave first written statement.

3:01 p.m.

Appellant, after again being advised of *Miranda* rights, signed a waiver, and gave another oral statement.

3:31–5:01 p.m.

Appellant gave second written statement.

7:09 p.m.

Appellant, after again being advised of *Miranda* rights, signed a waiver. Appellant consented to a voice stress analysis test.

**August 10:**

12:08 a.m.

Appellant, after again being advised of *Miranda* rights, signed a waiver.

12:10 a.m.

Appellant, after being advised of right to prompt present-ment, signed a waiver.

12:05 p.m.

Appellant, after again being advised of *Miranda* rights, signed a waiver.

12:10 p.m.

Appellant, after again being advised of right to prompt presentment, signed a waiver.

3:07–4:00 p.m.

Appellant gave a third written statement.[4]

---

**4.** Appellant, in his memorandum filed with this Court, states that this statement was given from 1:07 p.m.–2:00 p.m.

**August 11:**

Appellant was taken to a commissioner in the morning.

### Discovery And Motions

Trial was scheduled to begin April 17, 2001. At the end of a three day evidentiary hearing in early March, 2001, the circuit court denied Perez's motions to suppress his statements. At that hearing, Perez's counsel argued that Perez's statements resulted from an illegal arrest, because of the absence of probable cause, and that the statements were involuntary. The involuntariness argument was based on traditional grounds, referenced the totality of circumstances, and emphasized Perez's version of the facts. Delay in presentment was argued as a factor to consider. While unclear, we shall assume the argument was based on Maryland common law, as well as on the Federal and State Constitutions.

During discovery, defense counsel tried to obtain information regarding Mahar's statements implicating Perez, and in particular, information as to how the police got to Mahar.

On March 29, after the suppression hearing, the State disclosed to defense counsel that before Mahar implicated Perez, Mahar himself had been implicated in the murders. In a written statement to Prince George's County police, "Tony Fox" had stated that Mahar told him, while both were incarcerated, that Mahar "and a buddy" had committed these crimes.

Based on this information, defense counsel sought various forms of relief, including a new suppression hearing and a *Franks*[5] hearing. The defense alleged that on August 5, 2000, when Mahar and Fox were both incarcerated at the Prince George's County Detention Center, Mahar told Fox that while "he and a buddy" were robbing an animal hospital in Bladensburg, his "buddy" killed an Indian couple.

According to the defense, on August 7, Prince George's County homicide detectives interrogated Fox at the police

---

**5.** *See Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

station. Fox relayed Mahar's confession. The next day, detectives interviewed Mahar, who denied any involvement, instead claiming that he overheard Perez discussing the murders with Gordon and implicating both of them. Detective Hoffman then applied for and obtained arrest warrants for Perez and Gordon.

Defense counsel claimed that both statements by Fox and Mahar were coerced, and that Mahar's confession to Fox exculpated Perez because, if there was only one other participant in the crime, and that person was black, then it was Mahar and Gordon (who fit Shashi Tharpar's description of her assailant) who robbed and murdered the Tharpars.[6]

The court denied all the defense motions. Trial followed on April 17–20, 2001.

During trial, the court granted the State's motion to exclude the testimony of Fox, as well as the testimony of four police and emergency medical witnesses who heard Shashi Tharpar describe her murderer as a tall black man who had been in the animal hospital earlier that day. As a result, defense counsel elected not to call Mahar, in the asserted belief that, without that predicate testimony, the logical value of Mahar's confession was lost.

The jury convicted Perez of two counts of felony murder, two counts of robbery with a deadly weapon, two counts of using a handgun in the commission of a crime of violence, and conspiracy to commit robbery with a deadly weapon. He was sentenced to two terms of life without parole, two terms of twenty years, the first five to be served without parole, and a term of ten years.

Perez filed motions for discovery and a new trial, which were denied.[7] This appeal followed.

---

6. The record indicates that Fox and Mahar are "Caucasian," Perez is of "Puerto Rican descent," and Gordon is "African American."

7. Perez moved for discovery and a new trial based on evidence that defense counsel discovered after Perez noted this appeal. The new

## The Issues

Perez advances ten reasons why we should vacate his convictions, which we have rephrased:

1. The trial court erred in finding that defense counsel committed a *Batson* violation and in seating the challenged juror.

2. Perez's post-arrest statements to police should have been suppressed because they were the fruit of an illegal arrest under a warrant issued without probable cause.

 3. Perez's post-arrest statements to police should have been suppressed because they were the involuntary product of two days of pre-charging detention, coercion, threats, promises, and denial of his right to counsel.

4. The trial court erred in denying defense counsel's request for a jury instruction that, under Maryland law, a defendant must be taken to a judicial officer without unnecessary delay and in no event later than 24 hours after arrest.

5. The trial court erred in excluding exculpatory statements by Fox and by Mrs. Tharpar.

6. The trial court erred in failing to conduct a suppression hearing at which defense counsel could have examined newly discovered witnesses Fox and Mahar.

7. The State should have been ordered to disclose all statements made by Mahar, including any recantations.

8. The State should have been ordered to disclose the identity of any police officer who obtained information from Fox.

---

evidence was that a person named Antonio Myers had confessed to the murders several months prior to the arrest of Perez. Argument in this Court originally was scheduled before those motions were decided. We removed the case from our argument docket and remanded for a ruling on the motions. The trial court subsequently denied the motions.

9. The State should have been ordered to disclose files and documents regarding the information that Fox provided to police.

10. The trial court should have held a *Franks* hearing to determine whether the police intentionally misled the court in the application for Perez's arrest warrant.

We shall reach only the delayed presentment issue arising in the third assignment of error. For guidance, we also exercise our discretion to address the jury instruction issue in the fourth assignment and the evidentiary issue in the fifth assignment.

## DISCUSSION

### I. Delayed Presentment Issue

#### A. The Need For Prompt Presentment

A confession, to be admissible, must be voluntary under (1) Maryland non-constitutional law; (2) the due process clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights; and (3) elicited in conformance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Ball v. State*, 347 Md. 156, 173–174 and 178–79, 699 A.2d 1170 (1997), *cert. denied*, 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998).

"The use of coerced confessions, whether true or false, is forbidden because the method used to extract them offends constitutional principles." *Lego v. Twomey*, 404 U.S. 477, 485, 92 S.Ct. 619, 624, 30 L.Ed.2d 618 (1972). Given the inherently coercive nature of custodial interrogation, a custodial confession is presumed to be involuntary, unless the State shows beyond a reasonable doubt that the statement was voluntary. *See Hof v. State*, 337 Md. 581, 595, 655 A.2d 370 (1995). Under both the Federal Constitution and State common law, the totality of the circumstances must be considered to determine voluntariness. *See Ball v. State*, 347 Md. at 178–179, 699 A.2d 1170; *Hof*, 337 Md. at 595–97, 655 A.2d 370.

Under Maryland common law, a confession is inadmissible if made in reliance on improper promises or threats. *See Winder v. State,* 362 Md. 275, 309, 765 A.2d 97 (2001); *Ball,* 347 Md. at 178–179, 699 A.2d 1170; *Hillard v. State,* 286 Md. 145, 153, 406 A.2d 415 (1979).

Although there is no definitive list of circumstances relevant to voluntariness, the Court of Appeals has recognized that consideration should be given to a wide range of factors, including

> where the interrogation was conducted; its length; who was present; how it was conducted; whether the defendant was given *Miranda* warnings; the mental and physical condition of the defendant; the age, background, experience, education, character, and intelligence of the defendant; when the defendant was taken before a court commissioner following arrest; and whether the defendant was physically mistreated, physically intimidated or psychologically pressured.

*Hof,* 337 Md. at 596–97, 655 A.2d 370 (citations omitted).

The time of presentment to a judicial officer is one of the circumstances. The prompt presentment rule, first adopted in 1971, currently appears in Md. Rule 4–212. Subsection (e), applicable here, provides that

> [a] copy of the warrant and charging documents shall be served on the defendant promptly after the arrest. The defendant shall be taken before a judicial officer of the District Court without unnecessary delay and in no event later than 24 hours after arrest[.]

Prior to *Johnson v. State,* 282 Md. 314, 384 A.2d 709 (1978), the general criterion for admissibility of a confession was voluntariness. In *Johnson,* the Court of Appeals applied the 24 hour requirement as a *per se* rule of exclusion and held that statements obtained more than 24 hours after arrest would be suppressed. 282 Md. at 328–29, 384 A.2d 709. This decision was followed in *McClain v. State,* 288 Md. 456, 419 A.2d 369 (1980).

In 1981, the legislature repudiated the *Johnson–McClain* exclusionary rule, returning to the voluntariness standard. The statute currently appears at Md. Code (1974, 2002 Repl. Vol.), § 10–912 of the Courts and Judicial Proceedings Article, and provides:

**Failure to take defendant before judicial officer after arrest.**

(a) *Confession not rendered inadmissible.*—A confession may not be excluded from evidence solely because the defendant was not taken before a judicial officer after arrest within any time period specified by Title 4 of the Maryland Rules.

(b) *Effect of failure to comply strictly with Title 4 of the Maryland Rules.*—Failure to strictly comply with the provisions of Title 4 of the Maryland Rules pertaining to taking a defendant before a judicial officer after arrest is only one factor, among others, to be considered by the court in deciding the voluntariness and admissibility of a confession.

As explained in *Williams v. State*, 375 Md. 404, 421–22, 825 A.2d 1078 (2003), "[the *McClain* decision] did produce a swift legislative response. At the strong urging of the law enforcement community, the legislature, in its next session, enacted 1981 Maryland Laws, chapter 577 (Maryland Code, section 10–912 of the Courts and Judicial Proceedings Article). . . . There is no doubt that the statute was a delayed reaction to *Johnson* and an immediate reaction to *McClain*." *See also Woods v. State*, 315 Md. 591, 614, 556 A.2d 236 (1989)("Acts 1981, ch. 577 was the legislative reaction to our decision in *Johnson v. State* . . . ."); *Young v. State*, 68 Md.App. 121, 133, 510 A.2d 599 (1986) ("As of July 1, 1981, *Johnson* lost much of its effect. On that date the Maryland legislature abrogated the *per se* exclusionary rule of *Johnson*. . . .").

■ The Maryland legislature made it clear that voluntariness is the test, determined by a consideration of all relevant factors. The legislature did not address the weight to be given any particular factor, presumably because, under a totality of the circumstances test, the hearing judge generally

determines the weight of each factor, considered in the context of the whole. On appellate review of a voluntariness determination, an appellate court defers to first level factual findings but engages in a *de novo* review of the ultimate constitutional issue. *See, e.g., Polk v. State,* 378 Md. 1, 7–9, 835 A.2d 575 (2003); *Wilkes v. State,* 364 Md. 554, 569, 774 A.2d 420 (2001).

After the instant case was argued before a three judge panel of this Court, the Court of Appeals ruled, in a trilogy of cases, that, under certain circumstances, a delay in presentment should be given "very heavy weight" when considering the totality of circumstances. *See Facon v. State,* 375 Md. 435, 453–54, 825 A.2d 1096 (2003); *Williams v. State,* 375 Md. 404, 434, 825 A.2d 1078 (2003); *Hiligh v. State,* 375 Md. 456, 473–75, 825 A.2d 1108 (2003). As a result, we requested counsel to file supplementary briefs, addressing the effect of those decisions. We then heard oral argument, sitting *en banc.* Before considering Perez's arguments, therefore, we briefly review those decisions.

### Williams

In *Williams v. State,* 375 Md. 404, 825 A.2d 1078 (2003), the defendant was arrested at 4:10 a.m. on July 30, 2000, on suspicion of two armed robberies. He suffered a dog bite during the arrest, and was taken to the hospital for treatment. He was placed in an interview room at the police station at 9:25 a.m.

Williams had identified himself by his brother's name, but police found a paycheck bearing his own name in his pocket. Detectives from the Prince George's County robbery unit began preliminary questioning "to get some basic information about [this] suspect and even about his involvement in the two robberies." 375 Md. at 423, 825 A.2d 1078. During that questioning, they learned Williams' real identity and that arrest warrants charging him with three homicides had been issued nine days earlier. By 1:13 p.m., Williams had confessed to two robberies and written two statements confirming those confessions.

Homicide detectives transported Williams to an interview room. Over the next 28 hours, three different detectives intermittently interrogated Williams. Williams was left alone to sleep overnight. Before being taken to the commissioner for an initial appearance at 3:07 p.m. on August 1, 47 hours after his arrest, Williams gave several oral and written statements confessing to the three murders.

The Court of Appeals, recognizing that "[m]any factors can bear on the voluntariness of a confession[,]" specifically addressed how much weight a violation of the prompt presentment rule should have in assessing the voluntariness of a particular statement. 375 Md. at 423, 825 A.2d 1078. "[W]hile the statute makes a delay in presentment only one factor in determining voluntariness and admissibility, not all factors that may weigh on voluntariness are necessarily equal in import[.]" *Id.* at 416, 825 A.2d 1078. Discussing different factors bearing on voluntariness, the Court recognized three categories into which most of these can be grouped.

Confessions preceded or accompanied by threats, promises of advantage, or physical mistreatment are involuntary, "notwithstanding any other factors that may suggest voluntariness," because "[t]hose kinds of factors are coercive as a matter of law." 375 Md. at 429, 825 A.2d 1078. Unless the State can satisfy its "very heavy burden ... of proving that they did not induce the confession," these factors render the statement involuntary. *Id.* This appears to be a statement of when, under Maryland common law, statements are inadmissible as a matter of law. *See Winder, supra,* 362 Md. at 275, 765 A.2d 97.

Other factors, including "the length of the interrogation, team or sequential questioning, [and] the age, education, experience, or physical or mental attributes of the defendant," do not have such decisive weight. 375 Md. at 429–30, 825 A.2d 1078. Instead, these factors "assume significance, and may become decisive, only in the context of a particular case-based on the actual extent of their coercive effect." *Id.* at 430, 825 A.2d 1078.

But, "[l]ying between these two kinds of factors is a third" category. 375 Md. at 430, 825 A.2d 1078. The Court described these as "factors that may not be coercive as a matter of law but that need to be given special weight whenever they exist." *Id.* "[T]he deliberate and unnecessary violation of an accused's right to prompt presentment" falls into this "heavy weight" category. *Id.*

The Court, stating that it was harmonizing Rule 4–212 and section 10–912, ruled that, under certain circumstances, a delay in presentment must be given "very heavy weight." A delay must be given very heavy weight only when (1) the delay was unnecessary; (2) deliberate; and (3) it was designed for the "sole purpose" of obtaining a confession.[8] 375 Md. at 416, 825 A.2d 1078.

Williams' felony murder conviction was vacated because the suppression court gave "no indication" that it gave such weight to the continued delay and the trial court "did not instruct the jury to do so." *Id.* at 416, 434, 825 A.2d 1078. The Court also indicated that, based on the record before it, the delay in presentment should have been given very heavy weight.

### Hiligh

In *Hiligh v. State*, 375 Md. 456, 825 A.2d 1108 (2003), filed the same day as *Williams*, the Court of Appeals held that post-conviction relief was warranted because Hiligh's trial counsel did not ask the suppression court or the jury to consider the effect of a nearly 24 hour delay in presentment on the voluntariness of Hiligh's robbery confession. Shortly after the robbery of a Marriott hotel, Hiligh was arrested on

---

**8.** This test was repeated in *Hiligh*, 375 Md. at 472, 825 A.2d 1108. Although the *Facon* Court used different language to describe when very heavy weight is required, (for example, the test is described simply as "deliberate and unnecessary delay," 375 Md. at 453, 825 A.2d 1096), we do not read *Facon* as changing the test outlined in *Williams*. Mere unnecessary delay is not entitled to heavy weight, but rather, it is a factor entitled to the weight it deserves, like any other factor that is part of the totality of the circumstances.

suspicion of that crime. He arrived at the Prince George's County police station at 10:58 p.m. on March 20, 1995. Everything necessary to charge him had been accomplished by 3:30 a.m. on March 21, when the charging documents were ready.

Instead of being questioned or taken to a commissioner, Hiligh was left overnight in an interview room. At 7:15 a.m., detectives briefly took Hiligh to the hospital for minor medical treatment. At 8:35 a.m., they returned him to the same room.

Interrogation began shortly after 9:00 a.m. At 1:23 p.m., Hiligh signed his first inculpatory statement. He was then given food. He proceeded to sign an inculpatory statement about the Marriott robbery at 1:55, and to other robberies at 2:51, 3:18, and 4:45 p.m.

Once the detective from Prince George's County was finished interrogating Hiligh about robberies in that jurisdiction, Hiligh was questioned about other robberies outside the jurisdiction. Hiligh made more inculpatory statements during those interrogations.

Hiligh was separately tried for Howard County and Prince George's County robberies. In his Howard County trial, Hiligh's defense counsel unsuccessfully argued that the presentment delay justified exclusion of Hiligh's confession, both at a suppression hearing and at trial. On direct appeal, a divided panel of this Court held that the delay was unnecessary and that the confession should have been suppressed.

In contrast, in the Prince George's County trial, Hiligh's trial counsel neither elicited nor pointed to evidence regarding the delay in presentment. On direct appeal, we held that he had failed to preserve any challenge arising from the delay.

Citing the outcome and rationale of the Howard County appeal, the Circuit Court for Prince George's County granted Hiligh's postconviction petition for a new trial. A divided panel of this Court reversed, finding that the failure to raise the presentment delay was not prejudicially ineffective assistance of counsel.

The Court of Appeals disagreed and affirmed the post-conviction court's ruling. *See* 375 Md. at 475, 825 A.2d 1108. The Court explained:

> Had counsel argued the coercive effect of the deliberate delay in presentment, the court would have been required to give that delay very heavy weight and examine whether the State had shouldered its heavy burden of proving that the confession was not induced by that coercion. On this record, especially in light of the conclusion reached by the Court of Special Appeals in the Howard County appeal, there is, indeed, a substantial possibility that the court, in ruling on the suppression motion, would have found the confession involuntary and ruled it inadmissible. Even if the judge had allowed the confession into evidence, he would, under *Williams,* have been required, on request, to instruct the jury on the heavy weight to be accorded any deliberate and unnecessary delay. Furthermore, had counsel argued that point to the jury, there is the same substantial possibility that the jury would have found the confession involuntary and, in accordance with the judge's other instructions, disregarded it.

*Id.* at 474–75, 825 A.2d 1108.

### Facon

In *Facon v. State,* 375 Md. 435, 825 A.2d 1096 (2003), the Court held that a delay of more than 12 hours solely for the purpose of interrogation may have resulted in an involuntary confession to robbery. After being arrested on the evening of August 31, 1999, in the District of Columbia on a Maryland warrant, Facon waived extradition to Prince George's County. He arrived at the Prince George's County police station at 10:00 p.m. on September 1, 1999.

Facon was immediately placed in an interview room. From 10:30 until 11:55 p.m., a Prince George's County robbery detective discussed Facon's life, family, drug problems, and prior arrests. Facon refused to sign a *Miranda* rights waiver, saying that he would discuss the crime in question, but did not

" 'want to write anything, [or] . . . to make a statement.' " 375 Md. at 443, 825 A.2d 1096.

He was left alone in the room from 11:44 p.m. until 12:22 a.m. on September 2. At that time, the same officer returned and they discussed the same topics until 3:20 a.m. After another break until 4:25 a.m., a different officer discussed general matters about Facon's life. He told Facon that "he 'would absolutely relay that [Facon] has a bad narcotic habit to the state's attorney . . . and that was about the best [he] could do.' " 375 Md. at 443, 825 A.2d 1096.

From 5:55 a.m. until 6:35 a.m., Facon was photographed. Questioning resumed, and the officer told Facon that "they were 'done' talking about [his] background, and began to review the evidence against [Facon]." 375 Md. at 443, 825 A.2d 1096. By this time, Facon " 'was getting tired,' " but asked " 'what does the statement entail.' " *Id.* Facon repeated that he did not want to write anything down. The officer replied that Facon would " 'have to sign a waiver form or we don't get into the statement.' " *Id.*

At 7:08 a.m., Facon executed the *Miranda* rights waiver form. 375 Md. at 444, 825 A.2d 1096. At 7:45 a.m., he confessed to robbing a convenience store while he was under the influence of drugs. He was taken to a district court commissioner at 10:30 a.m., just over 12 hours after his arrival in the county.

The Court of Appeals first examined the extraterritorial effect of Md. Rule 4–212, addressing

> [w]hether the twenty-four hour period following arrest, during which police are required to present an arrestee to a court commissioner, begins only when the arrestee enters the prosecuting jurisdiction, or includes that period of time following arrest in a neighboring jurisdiction.

375 Md. at 440, 825 A.2d 1096. The Court held "that the prompt presentment requirement under the Rule is not triggered where the defendant is held in custody outside of this State, absent evidence that officers of this State were working

in conjunction with the other jurisdiction for purposes other than to secure extradition." *Id.* at 449, 825 A.2d 1096.

The Court held that the time between arrest in another jurisdiction and arrival in Maryland must be considered in assessing voluntariness. Citing *Williams,* the *Facon* Court concluded that the Rule was violated even though presentment occurred within 24 hours after Facon arrived in Maryland. *See* 375 Md. at 453, 825 A.2d 1096. The suppression court erred in failing to "give *any* weight to the time [Facon] was in custody except for the period of time [he] spent with the interrogating officer[.]" *Id.* at 454, 825 A.2d 1096. The Court ordered a new trial with a new evidentiary hearing on Facon's motion to suppress his confession, at which he could "present any evidence he deems relevant." *Id.*

### B. Suppression

Before trial, Perez moved to suppress the statements he made during custodial interrogation. The suppression court denied Perez's motion, stating:

> The Court, after considering the testimony of the defendant and the police officers and their rebuttal, also reviewing the pertinent opinions from the Appellate Courts, considers the totality of the circumstances and denies the motion to suppress.

In this Court, Perez renews his argument that his confessions should have been suppressed due to the delay in presentment, the "tag-team approach to interrogation," the "continued interrogation in the [face] of repeated denials of guilt[,]" and "[t]he length of the interrogation[.]" He complains that the suppression court "denied the motion, without making any explicit findings of fact."

The State initially countered that the circuit court's decision should be upheld, given the number of hours that Perez was actually subjected to questioning; that he was allowed to sleep; and that he was given adequate food, drink, and bathroom opportunities. After considering *Williams; Hiligh,* and *Facon,* however, the State conceded that "Perez is enti-

tled to a remand for a new suppression hearing and trial." We agree, for two reasons.

■ First, the suppression court did not make any specific factual findings. Only when findings are not required to review the suppression ruling, may we do so. *See Gilliam v. State,* 320 Md. 637, 647, 579 A.2d 744 (1990). When there are conflicts in the evidence, and findings are necessary for our independent constitutional review, however, we cannot affirm. *See Lodowski,* 307 Md. at 253, 513 A.2d 299. In the case before us, as previously indicated, Perez contradicted much of the State's evidence, and there were several statements made at different times. Consequently, we might conclude that, in this case, specific findings were required for meaningful appellate review.

We do not rest our decision on that ground, however, because if the problem were only a lack of specific findings, an option that we would have to address is whether to remand, without vacating the convictions, for the court to make findings on the existing record. *See Southern v. State,* 371 Md. 93, 111, 807 A.2d 13 (2002). We need not decide whether we could and should remand for findings because we are compelled to vacate the convictions and remand for a new trial and suppression hearing because of the second reason.

The second reason is that the *Williams* Court, while not adopting "a new rule or any mandated procedure[,]" articulated a standard for how to assess a deliberate violation of the presentment rule, applicable to both a suppression court and a jury. 375 Md. at 433, 825 A.2d 1078.[9] Ordinarily, on appellate

---

9. Prior to recent decisions by the Court of Appeals, this Court frequently upheld a hearing court's determination of voluntariness, even with lengthy delays in presentment, based on a consideration of the totality of the circumstances. *See Whittington v. State,* 147 Md.App. 496, 519, 526, 809 A.2d 721 (2002), *cert. denied,* 373 Md. 408, 818 A.2d 1107 (2003) (18 hours between arrest and statement and 28 hours between arrest and presentment before commissioner); *Hamwright v. State,* 142 Md.App. 17, 41, 787 A.2d 824 (2001), *cert. denied,* 369 Md. 180, 798 A.2d 552 (2002) (11 hours between arrest and statement); *Bey v. State,* 140 Md.App. 607, 614–622, 781 A.2d 952 (2001), *cert. denied,* 368 Md.

review, the Court assumes that the hearing or trial court knew the law and properly applied it. *See State v. Chaney*, 375 Md. 168, 179, 825 A.2d 452 (2003) ("trial judges are presumed to know the law and to apply it properly"). We cannot engage in that presumption here because, not only is there a lack of specific findings, but neither *Williams; Hiligh*, nor *Facon* had been decided at the time of the proceedings in circuit court. Nevertheless, the *Williams* standard applies to this case because the issue was preserved and is still on direct review, and a decision interpreting a statute or rule, but not changing the common law, generally applies to pending cases. *See American Trucking Assns., Inc. v. Goldstein*, 312 Md. 583, 591–592, 541 A.2d 955 (1988); *McClain v. State*, 288 Md. 456, 464, 419 A.2d 369 (1980); *Schiller v. Lefkowitz*, 242 Md. 461, 466, 219 A.2d 378 (1966).

Importantly, whether the holding in a new decision applies to all pending cases, to certain pending cases, or to causes of action or events that occur after the date of the new decision, the holding in the new decision applies to the parties before the court that produced that decision. *American Trucking*, 312 Md. at 592, 541 A.2d 955. The parties before the court do not get an opportunity to relitigate the relevant issue. Other-

---

526, 796 A.2d 695 (2002) (1 to 4 hours between arrest and statement and 21 hours between arrest and presentment before commissioner); *Marr v. State*, 134 Md.App. 152, 165–66, 759 A.2d 327 (2000), *cert. denied*, 362 Md. 623, 766 A.2d 147 (2001) (35 hours between arrest and statement and approximately the same time between arrest and presentment before a commissioner); *Bhalla v. State*, 2000 Md.App. Lexis 168, *68–*72 (2000) (4 hours between arrest and statement and 9 hours between arrest and presentment before a commissioner). In all of these cases, the length of the delay was considered merely as one factor, with the ultimate issue being voluntariness.

The Court of Appeals did the same, applying a totality of the circumstances test to determine voluntariness, and discussing delay in presentment as one factor to consider without distinction. *See e.g., Hof v. State*, 337 Md. at 596, 655 A.2d 370 (consideration of whether defendant was presented to commissioner within 24 hours simply one factor when determining voluntariness); *Woods*, 315 Md. at 613–14, 556 A.2d 236 (confession admissible even though defendant expressly refused to waive prompt presentment); *Lodowski v. State*, 307 Md. 233, 254–55, 513 A.2d 299 (1986) (listing the various factors to be considered in determining voluntariness).

wise, there would be little motivation to seek new rules of law or new interpretations of existing law. *Stover v. Stover,* 60 Md.App. 470, 476, 483 A.2d 783 (1984). Consequently, in *Williams,* while the case was remanded for a determination of the admissibility of Williams' statements, an issue not decided on appeal, it was not remanded for a determination of whether the heavy weight standard applied. The heavy weight standard was adopted in *Williams,* and therefore was applied to the facts before the Court in that case.[10]

We shall address how application of the *Williams* standard is to be accomplished, because the way that it was applied in *Williams* does not necessarily determine how it should be applied in other cases. We read *Williams* as clearly announcing a new standard applicable to delays in presentment, for the reasons set forth above. We do not read the opinion as holding either that a new evidentiary suppression hearing is not permitted or holding, as a matter of law, that the heavy weight standard applies to a particular set of facts. Clearly there may be factual situations where the heavy weight standard does apply as a matter of law as well as fact, but this determination should be made by the suppression court, after a new hearing, as part of its consideration of the totality of the circumstances.

The question that separates the majority opinion of this Court from the opinion authored by Judge Adkins is whether the *Williams* court mandates a conclusion that the heavy weight standard applies as a matter of law. In her concurring and dissenting opinion, Judge Adkins concludes that it does.

■ We conclude that, for the reasons set forth in this opinion, a new evidentiary suppression hearing may be conducted in the case before us. We are not holding that one or

---

10. In *Hiligh,* the Court applied the heavy weight standard and affirmed the circuit court's grant of a new trial by way of post conviction relief. The Court did not expressly address the question of a new suppression hearing, but the right to such a hearing is implicit. In *Facon,* the Court again applied the heavy weight standard and expressly recognized the right to a new evidentiary suppression hearing on remand.

more of appellant's statements are inadmissible as a matter of law or that application of the heavy weight standard is mandated. After the trial court makes a determination, its ruling will be subject to appellate review. We are merely holding that the trial court makes the determination in the first instance.

Having decided that a new suppression hearing is warranted, we must vacate appellant's convictions for two reasons. First, as a general matter, we are not permitted to do so under Maryland law. *Southern,* 371 Md. at 111–12, 807 A.2d 13; *Gill v. State,* 265 Md. 350, 289 A.2d 575 (1972). Second, in light of *Williams,* the jury instructions will be different, as discussed below.

In *Southern v. State,* the Court of Appeals held that this Court erred by remanding the case, requiring the circuit court to rule on the constitutionally of a detention in a new suppression hearing, without first vacating the convictions. 371 Md. at 111–12, 807 A.2d 13. Additionally, however, the Court held that the ruling on the motion to suppress became the law of the case because the State failed to meet its burden of proof at the suppression hearing, and on remand, the State was not entitled to another hearing. *Id.* at 106–07, 807 A.2d 13. That is not the situation here and the law of the case doctrine does not apply. *See Tu v. State,* 336 Md. 406, 420, 648 A.2d 993 (1994) ("Reversal for the erroneous denial of a motion to suppress does not, in and of itself, preclude any trial court reconsideration of the admissibility of the State's evidence that was the subject of the suppression motion, at least if the reconsideration presents a legal theory that was not ruled upon on the prior appeal. Further, facts that are relevant to applying that previously unadjudicated legal theory and that were not previously presented may be considered by the trial court, even if those facts were known to the State at the time of the original trial court ruling"); *Lodowski,* 307 Md. at 256–58, 513 A.2d 299 (stating that the remedy when findings at a suppression hearing were inadequate was a new trial and a "new plenary suppression hearing").

The suppression court, on remand, should conduct a new hearing and make a determination regarding whether there was unnecessary delay for the deliberate and sole purpose of obtaining a confession and, based on that determination, apply the appropriate standard. The Court of Appeals recently reaffirmed that an appellate court should defer to a trial court's findings of facts, even when the issue is a violation of the First Amendment, which requires especially close appellate review. *Polk v. State,* 378 Md. 1, 21, 835 A.2d 575 (2003). Whether delay in presentment was unnecessary, deliberate, and for the sole purpose of obtaining a confession involves, at least in part, first level fact finding.

The Court of Appeals in *Johnson v. State* specifically recognized that not all delays are unnecessary, much less for the deliberate and sole purpose of obtaining a confession. 282 Md. 314, 329, 384 A.2d 709 (1978). For example, a delay may be necessary for routine administrative procedures, to determine whether a charging document should be issued, to verify the commission of the crimes specified in the charging document, to obtain information likely to be a significant aid in averting harm to persons or loss of property, to obtain relevant non-testimonial information likely to be significant in identifying other persons who might have been involved with the arrestee, or to prevent the loss of evidence. *Id.*

In the case before us, the record indicates that, prior to the arrest of appellant, someone named Mahar confessed to someone named Fox that he and another person committed the crimes in question. At the time of that confession, Mahar and Fox were incarcerated in the Prince George's County Detention Center. Presumably, Fox told the police. The police then questioned Mahar, who advised them that appellant and someone named Gordon had committed the crimes. The police obtained arrest warrants for appellant and Gordon.

It is also relevant to note that the victim, Shashi Tharpar, identified her murderer as a tall black man in the dying declaration discussed below. The record indicates that Gordon fit that description. Additionally, a detective testified that

it was his understanding that an arrestee could not be kept unnecessarily for the purpose of obtaining a confession and that the police kept appellant to follow up on leads.

Finally, we note, before moving to the effect of waivers, that pursuant to section 10–912, a delay in presentment, even of the type that meets the heavy weight standard, cannot be the sole reason for finding involuntariness. Additionally, it is worth repeating that the ultimate issue is voluntariness. Voluntariness is determined by the totality of the circumstances and compliance with the presentment rule is one factor. Since *Williams*, if it is determined that one of the factors is deliberate noncompliance with the prompt presentment requirement for the sole purpose of obtaining a confession, that factor is to be given very heavy weight.

On remand, therefore, the court should consider the arguments made by the parties, all relevant evidence and, with respect to each statement, determine whether the heavy weight standard applies. If so, the court should utilize this standard in making a voluntariness determination. In determining voluntariness, and thus admissibility, the court should resolve factual disputes and identify the circumstances considered by it as part of the totality.

## C. Waiver

As part of the voluntariness determination, the court should also consider the waivers executed by appellant. The *Williams* Court did not base its decision on waiver, or the lack thereof, but it did state that a voluntary waiver is valid. 375 Md. at 432–33, 825 A.2d 1078. Indeed, the Court squarely upheld the validity of waivers with respect to a delay in presentment, even when the exclusionary rule was in effect, in *Logan v. State*, 289 Md. 460, 425 A.2d 632 (1981).[11] In *Simkus*

11. Based on our review of reported appellate decisions, we infer that during the time of the exclusionary rule, law enforcement agencies utilized waiver forms expressly referring to prompt presentment. Several reported cases in that time period deal with waivers. It appears some or all of law enforcement agencies stopped using waivers expressly keyed to presentment, presumably in reliance on the law as it existed

*v. State,* 296 Md. 718, 721–22, 464 A.2d 1055 (1983), the Court upheld the validity of a prompt presentment waiver when the arrestee was not told that he could terminate the interrogation or that he would be taken before a judicial officer without delay.

As observed in *Williams,* the federal courts have not been uniform in addressing delay in presentment when the delay exceeds 6 hours. Similarly, with respect to express waivers, the federal courts have not been uniform. Many courts have held that a valid waiver of *Miranda* rights constitutes a valid waiver of prompt presentment. The District of Columbia has so held even in situations where the delay is comparable or even longer than the delay in the case before us. *See, e.g., Outlaw v. United States,* 806 A.2d 1192, 1200 (D.C.2002) ("We have held repeatedly that a valid waiver of an individual's *Miranda* rights is also a waiver of his *Mallory* right to presentment without unnecessary delay.") (internal quotations omitted), and *United States v. Bell,* 740 A.2d 958, 963 (D.C.App.1999).

Many courts have stated that a *Miranda* waiver constitutes a waiver of prompt presentment, but despite using unqualified language, the facts frequently, but not always, involved a relatively short period of delay. In some of the cases, it appears the delay was not deliberate for a malevolent purpose, and in other cases, it is not clear. *See, e.g., United States v. Salamanca,* 990 F.2d 629, 634 (D.C.Cir.1993) ("The *Miranda* decision substantially undercut the need for exclusion of custodial statements solely on the ground of delay in bringing the defendant before a magistrate, as one of the purposes of appearing before a magistrate is to have the defendant's rights explained to him—rights now explained in a *Miranda* warning."); *Pettyjohn v. United States,* 419 F.2d 651, 656 (D.C.Cir.1969) ("by validly waiving his Miranda right to silence and an attorney, and by agreeing to speak with the police, [appellant] has thereby also waived any *Mallory* right

---

after 1981, when the focus was on traditional voluntariness and *Miranda.* That must remain the focus in light of the Maryland statute.

to be brought before a magistrate as quickly as possible.") (internal quotations omitted); *O'Neal v. United States,* 411 F.2d 131 (5th Cir.1969) (noting that, following *Miranda,* if a suspect is given the necessary warnings, and if, knowing this, he still chooses to speak, he cannot then claim to be harmed under *Mallory* for the delay in being taken to the Commissioner); *United States v. Christopher,* 956 F.2d 536, 538 (6th Cir.1991) (upholding the District Court's finding that appellant's waiver of *Miranda* rights also constituted a waiver of his right to prompt presentment); *United States v. Barlow,* 693 F.2d 954, 959 (6th Cir.1982) ("waiver of one's *Miranda* rights also constitutes a waiver under *McNabb[ v. U.S.,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819] *Mallory"*); *United States v. Indian Boy X,* 565 F.2d 585, 591 (9th Cir.1977) (stating that a waiver of *Miranda* rights also constitutes a waiver of prompt presentment); and *United States v. Lukens,* 735 F.Supp. 387, 391, n. 1 (D.Wy.1990) ("Even assuming arguendo that the delay was unnecessary, suppression of the statements would nonetheless be inappropriate in view of his valid *Miranda* waiver....").

Moreover, a long delay may be relevant to the voluntariness of a *Miranda* waiver, even if a *Miranda* waiver is otherwise effective to waive the right to prompt presentment. *See United States v. Wilson,* 838 F.2d 1081 (9th Cir.1988) ("The government's reliance on the waiver of *Miranda* rights becomes weaker as the period of pre-arraignment detention increases. If unreasonable delay ... can itself form the basis for a finding of involuntariness, that same delay may also suggest involuntariness of the *Miranda* waiver.").

In the case before us, appellant signed 8 waivers: 6 expressly relating to *Miranda* rights and 2 expressly relating to delay in presentment. While we are not suggesting that Maryland law follows *Pettyjohn* and that a *Miranda* waiver constitutes a waiver of a violation of the prompt presentment rule, waivers are part of the totality of the circumstances and relevant to a voluntariness determination.

Additionally, in the case before us, Perez was advised of his *Miranda* rights immediately and repeatedly. It is not clear whether Perez was given a copy of the charging document, application, or arrest warrant or, if so, when. It is not clear whether one or more of those documents contained a statement of a right to be presented to a judicial officer. It is unknown whether Perez was orally advised of his right to prompt presentment other than when he executed written waivers expressly referring to that right. These factors may be relevant to voluntariness of a statement.

Of particular relevance here is the effect of a waiver of prompt presentment occurring after the prompt presentment requirement may have been violated. In the context of this case, by analogy to *Miranda* rights, in the event of a prompt presentment violation, followed by a valid waiver, a confession obtained after a valid waiver would not necessarily be tainted. *See Oregon v. Elstad,* 470 U.S. 298, 314, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *Kennedy v. State,* 289 Md. 54, 68–69, 421 A.2d 1376 (1980) (a confession obtained after presentment to two different commissioners held voluntary, despite earlier violation of prompt presentment rule). In *Meyer v. State,* 43 Md.App. 427, 437–39, 406 A.2d 427 (1979), this Court held that illegal delay had been dissipated by presentment to a commissioner, rest for two hours, and a *Miranda* waiver, preceding renewed interrogation resulting in a confession.

Perez executed two written waivers expressly relating to delay in presentment. Those waivers, if otherwise effective,[12] waive only any delay in presentment violations that occurred subsequent to the waivers. Moreover, the waivers are not relevant to determine whether statements made prior to the waivers were voluntary. The subsequent violations of the prompt presentment Rule, however, if validly waived, would not necessarily be tainted by a violation(s) that occurred prior to the waivers. In other words, if the waivers were

---

**12.** See the discussion in *Williams,* 375 Md. at 432–33, 825 A.2d 1078. *But see Logan,* 289 Md. 460, 425 A.2d 632, and *Simkus,* 296 Md. at 721–22, 464 A.2d 1055.

voluntarily given, even if a violation of the prompt present-
ment Rule occurred prior to the waiver, and the delay was
deliberate and purposeful, subsequent confessions would not
necessarily be inadmissible, if they were otherwise voluntary.
This statement would also be true if the prior violation, as one
factor to consider, resulted in a determination that confessions
prior to the waiver were inadmissible. For example, in this
case, the remand court could determine that, prior to the
express waiver of presentment which occurred after 23 hours,
the prompt presentment Rule had been violated, either delib-
erately and purposefully or merely unnecessarily. When con-
sidered with all other relevant factors, the remand court could
then find that the earlier confessions were involuntary. The
court could nevertheless determine that the waiver of present-
ment was voluntary and that the subsequent confessions were
thus voluntary and admissible.

To the extent that the effect of waivers in a situation like
the one before us is unclear, it constitutes another reason why
the suppression court, on remand, should review the issues *de
novo.*

## II. Jury Instructions

To guide the trial court and parties on remand, we shall
reach the related issue of whether the trial court should have
instructed the jury about the presentment requirement in Md.
Rule 4–212.

At trial, Perez's counsel asked the trial court to instruct the
jury about the prompt presentment requirement by reading
Rule 4–212. The court refused to do so. Instead, it gave the
following instruction, taken from a pattern instruction regard-
ing statements made by a defendant:

In deciding whether the [defendant's] statement was vol-
untary, consider all of the circumstances surrounding the
statement, including ... whether the defendant was taken
before a district court commissioner without unnecessary

delay following the arrest, and, if not, whether that affected the voluntariness of the statement[.]

*See* MPJI–Crim. 3:18 (2001).

Perez argues that the trial court erred in refusing to tell the jury "that the law provides that a defendant must be taken before a judicial officer of the District Court without unnecessary delay and in no event later than 24 hours after arrest." In his view, the court's brief mention of unnecessary delay was materially incomplete in that:

(1) "it contained no reference to any specific period of time," so that jurors did not have a "yardstick by which to measure ... what 'unnecessary' delay could be" or whether the two day delay in presenting Perez to the commissioner affected the voluntariness of his statements; and

(2) "[t]he instruction did not touch upon the impeachment value of the 24 hour rule, in weighing the credibility of some of the State's witnesses."

The State contends that the pattern jury instruction given by the trial court was sufficient because:

(1) "the jury was made aware of the substance of Rule 4–212(e), even if the number '24' was not actually contained within the trial judge's instruction," through defense counsel's cross-examination of police detectives and closing argument; and

(2) "giving the requested instruction ... would have been misleading" in that it "would suggest a 'hard and fast' rule where none exists[.]"

When a defendant challenges the voluntariness of a custodial confession at trial, the court must give a requested voluntariness instruction even if the court is convinced the statement was voluntary. *See Hof v. State,* 337 Md. at 601, 655 A.2d 370; *Brittingham v. State,* 306 Md. 654, 666–67, 511 A.2d 45 (1986); *Bellamy v. State,* 50 Md.App. 65, 73, 435 A.2d 821 (1981), *cert. denied,* 292 Md. 376 (1982). The pattern jury instruction provides that the jury must find that a defendant's statement was voluntary beyond a reasonable doubt, and if the jury so finds, it should give it such weight as it believes it

deserves. The instruction utilizes a totality of the circumstances approach and lists various factors, including delay in presentment.

In *Williams* and *Hiligh*, the Court of Appeals recognized that defendants challenging the voluntariness of a confession are entitled to a jury instruction with respect to the standard adopted by *Williams*. There is no indication, however, that the pattern instruction does not accurately state the law, except for the Williams standard, and the jury should be instructed to consider all relevant circumstances. The difference is that the jury should also be instructed that, in determining voluntariness, it must determine whether any delay in presentment was unnecessary, deliberate, and for the purpose of obtaining a confession and, if so, to give that factor very heavy weight. The *Hiligh* Court held that, "[e]ven if the [suppression] judge ... allowed the confession into evidence, he would, under *Williams*, have been required, on request, to instruct the jury on the heavy weight to be accorded any deliberate and unnecessary delay." *Hiligh*, 375 Md. at 474, 825 A.2d 1108. In the event of a waiver, or waivers, as in this case, if the confession is determined to be admissible, the jury should nevertheless be instructed to determine voluntariness of such waivers. *See Hof*, 337 Md. at 601, 655 A.2d 370.

To be sure, neither counsel nor the trial court had the benefit of *Williams, Hiligh,* or *Facon* at trial. We recognize that defense counsel did not request the "heavy weight" instruction that he was entitled to under *Williams* and *Hiligh*. Instead, he asked for the text of the prompt presentment rule itself, including its "24 hour" provision.

 Whether the 24 hour provision in Rule 4–212 should be incorporated into an instruction, a question different from the heavy weight instruction, depends on the circumstances of each case. In some cases, where delay is an issue, the 24 hour period may not be the issue. In this case, where the delay exceeds 24 hours, it seems advisable to include the 24 hour provision. When the delay is less than 24 hours, however, it should not be given if, in the context of the trial, it would

mislead the jury into believing the State has at least 24 hours. If it is given, care should be taken to explain that the State is not automatically entitled to 24 hours. In all events, the jury should be instructed that unnecessary delay is but one of the factors to consider.

Because Perez's convictions are being vacated, we need not decide whether a failure to include a reference to the 24 hour period, as requested, constituted reversible error, or whether cross-examination, exhibits, and argument by counsel, referring to the 24 hour period, adequately advised the jury of the requirements imposed under Rule 4–212.

### III. Dying Declaration

Perez contends that the trial court abused its discretion and materially prejudiced his defense by precluding testimony from four witnesses who heard Shashi Tharpar identify the person who shot her as a tall black male. Because Perez is 5'7" and light skinned, and there is no evidence that Perez fired the shots that killed either of the Tharpars, Perez hoped to use this description of the assailant as an exculpatory dying declaration.[13] The admissibility of Shashi Tharpar's statements is likely to recur in any retrial, so we shall address it for the benefit of the remand court and the parties.

Under Md. Rule 5–804(b)(2), if the declarant is unavailable as a witness in a homicide prosecution, the rule against hearsay does not exclude a "statement made by a declarant, while believing that the declarant's death was immi-

---

**13.** Perez also hoped to combine Mrs. Tharpar's description of her assailant with evidence that Mahar, who was not African–American, said that he and a buddy committed these murders, as grounds for raising reasonable doubt as to whether he or Mahar was with Gordon when he murdered the Tharpars. The trial court ruled that Mahar's out-of-court statement against penal interest was inadmissible because Mahar was not "unavailable" to testify at trial. *See* Md. Rule 5–804(b)(3). There was some factual dispute as to whether Mahar would assert his Fifth Amendment rights if called as a witness. Given our decision that Perez is entitled to a new trial, whether Mahar's statement is admissible may depend on whether he is available to testify at any new trial.

nent, concerning the cause or circumstances of what the declarant believed to be his or her impending death." The statement may be made in response to a question, but must reflect the victim's personal knowledge. *See* 6A Lynn McClain, *Maryland Evidence* § 804(2):1(b), at 425–26 (2d ed. 2001). Statements identifying the person who shot the victim fall within this rule. *See Connor v. State*, 225 Md. 543, 553, 171 A.2d 699, *cert. denied*, 368 U.S. 906, 82 S.Ct. 186, 7 L.Ed.2d 100 (1961); *Jones v. State*, 38 Md.App. 288, 298, 380 A.2d 659 (1977), *rev'd on other grounds by State v. Frye*, 283 Md. 709, 393 A.2d 1372 (1978).

■■■■■ The admissibility of a dying declaration depends on whether, at the time the victim made the statement, he or she believed that death was impending. *See Connor*, 225 Md. at 551, 171 A.2d 699. "The required abandonment of all hope of recovery may be proved by the declarant's statement or by others' statements to the declarant, or it may be inferred from the circumstances[,]" including "the fatal quality of the wound." *McClain, supra*, at 426; *see Jones*, 38 Md.App. at 298, 380 A.2d 659. It is not "necessary for the victim to state that she expected to die. It is sufficient if her condition is such (and she is aware of it) as to warrant an inference of impending death." *Connor*, 225 Md. at 551, 171 A.2d 699. For example, a shooting victim's request for a priest or for someone to take care of her child may indicate the victim's belief in her impending death. *See id.* Alternatively, a statement by another person to the victim, or in the victim's presence, might establish that the victim heard something that caused her to believe that she was likely to die soon. *See Jones*, 38 Md.App. at 298, 380 A.2d 659.

A victim's request for medical help does not necessarily mean that she holds out hope for recovery. In *Jones*, we recognized that a victim of a shotgun blast had abandoned all hope of recovery even though he asked to be taken to the hospital and requested medical help. The victim's statements that he knew he was dying were not negated by his "requests for medical assistance, which indicated hope for amelioration

of pain but not a hope of recovery." *Jones*, 38 Md.App. at 300, 380 A.2d 659.

Here, the trial court granted the State's motion *in limine* to exclude testimony about Mrs. Tharpar's description of her assailant, after defense counsel proffered statements by three police officers and one emergency medical technician.[14] To establish admissibility, defense counsel pointed to one statement by an emergency medical technician:

> [Defense Counsel]: Your Honor, I've got Christie Branan ... and she's going to say that the victim was conscious of being shot, conscious of where she was shot, she's covered in blood, she wiped her mouth full of blood so she could talk, she was alert, she was oriented, she was conscious of her pain, she said she knew the person who shot her, he worked at the office. I have her statement here.[15]
>
> [Prosecutor]: It does not address my objection that she knew she was dying. In fact, just the opposite.
>
> [Defense Counsel]: I have case law, [*Willie Lee Jones*], Court of Special Appeals, *Connor versus State* .... All these cases agree that the [declarant's] belief of impending death may be inferred from the circumstances in which the declarant is found at the time the declarant makes the declarations....
>
> The Court: But I think to be cautious that if he's able to establish that she is aware she is dying—
>
> [Prosecutor]: There's no evidence that she knew she was dying.
>
> The Court: Do you have any evidence?

---

14. We also note that, at trial, Corporal Charles Cowling testified that he responded to the animal hospital. He found Dr. Tharpar lying face down in a pool of blood, and Mrs. Tharpar also lying on the floor. He thought she was "either unconscious or dead." When his police radio sounded, though, "she began to talk to [him]" in a "very calm" voice. "[S]he asked [him] for help" and "told [him] that she had been shot and that she was in pain." He called for additional officers and an ambulance.

15. Branan's statement said only that, when she asked Mrs. Thompson whether she knew her assailant, "she replied with he was new."

**[Defense Counsel]: She died very shortly thereafter. She knew she'd been shot in the face. She knew—she thought she'd been shot in the head. She'd been shot in the neck[,] over one eye[,] and over the other eye. Of course she somehow thought she was dying. And the jury can infer from the circumstances that she did. Her belief in her impending death may be inferred from the circumstances in which she. . . .**

The Court: Any more of the facts?

[Defense Counsel]: Any more of the facts, no.

The Court: All right. Your motion *in limine* is granted. The Court is not satisfied that she was aware of the very first requirement, impending death. (Emphasis added.)

Defense counsel noted that he also had statements from three police witnesses and pointed out that "we need to establish . . . the identity of the assailant, and we need to exclude . . . Perez, and that's what these dying declarations are all about." Repeating that it did "not believe it's a dying declaration[,]" the court again granted the motion. Defense counsel then asked to have all four statements "put . . . into evidence for the ruling upon the motion in limine." The court accepted the statements, but allowed them only to be "placed on the record."

In their written statements, the four witnesses related that they heard Shashi Tharpar describe her assailant:

Sgt. M.L. Romba responded to the animal hospital at 13:20 on September 15, 1999. He found Shashi Tharpar "laying under the counter" and "drifting in and out." She was alert but "in a great deal of pain." "She stated that a black male had entered the store three time[s] during the day and asked questions about a cat." She described him "as a tall thin black male."

Police Officer Denault responded at 13:27. He asked Shashi Tharpar "for a description of the suspect, and she stated that he was black and that he was tall." She also "stated that the suspect had come into the hospital three times."

Christine Branan, an emergency medical technician, stated that "while doing [a] patient assessment," she asked Mrs. Tharpar "where she felt she might have been shot. She replied 'the back of her head.'" She stabilized her neck and "clear[ed] her airway from the copious amount of blood[.]" She "kept conversation with her by asking her did she know the person who may have shot her. She said yes. [Brannan] asked her did he work at the office [and] she replied with he was new. Shortly [they] arrived at the hospital." Police officer T. Boone stated that while he was in the trauma room at Prince General Hospital, Shashi Tharpar told him her name, date of birth, and age. She "stated that the suspect was a black male in his 30's wearing a gray shirt." He was "tall" with "short hair." She "stated that she never met the suspect prior to the shooting." She was pronounced dead at 15:06.

Given the delayed presentment grounds for vacating Perez's conviction, we need not decide whether the trial court abused its discretion in excluding the evidence based solely on the limited verbal proffer of defense counsel. To guide the court and the parties on remand, however, we shall address Perez's complaint that the court should have admitted Mrs. Tharpar's description of her lone assailant.

As defense counsel pointed out, there was compelling circumstantial evidence to support a finding that Shashi Tharpar was aware of her impending death. At the time she described her assailant, Mrs. Tharpar had been shot over both eyes and in the neck. She also suffered severe blunt force trauma to the back of her head. She was found lying near her murdered husband, in a pool of her own blood; at times, she had to have her mouth cleared of blood to speak; and, by all accounts, she was in a great deal of pain. She explicitly stated that she was aware that she had been shot in the head.

Moreover, there was circumstantial evidence to support a finding that her statements were reliable. Witnesses described her as alert despite her pain and wounds. She obviously was able to provide responsive answers to questions

from a number of police and medical personnel. Her descriptions of her assailant to them were consistent. In the hour and a half before she died of her head wounds, she identified a single, tall, black, male assailant. That description supported Perez's claim that he was not the shooter and that he was not present for the crimes, and was potentially inconsistent with the State's theory that Perez was present and took an active role during the robbery and murders.

Nonetheless, we see nothing that necessarily **required** the trial court to conclude that Mrs. Tharpar believed she was about to die. She made no statements to that effect, nor was there evidence that any medical or police personnel told her so. There was no evidence that she exercised her faith in a manner indicating her belief that she was dying, or that she expressed other sentiments or wishes indicating that belief. Therefore, we cannot say that the trial court necessarily erred in concluding that the evidence was not sufficient to establish that Mrs. Tharpar believed she would die soon.

What concerns us, however, is that the trial court asked for "more facts[,]" then immediately ruled that it was "not satisfied that she was aware of the very first requirement, impending death[,]" without saying why it was not satisfied with the "facts" that were presented and without reviewing the three statements by the police officers. This brief rationale for excluding the statements leaves us uncertain whether the trial court understood that it was not necessary for the defense to present direct evidence, such as statements by Mrs. Tharpar or statements to her, in order to establish that she believed she would soon die.[16]

---

**16.** *See generally Weinstein's Fed. Evidence* § 804.05[4][b] (2003) ("The declarant's belief in the imminence of death may be shown by the declarant's own statements, *or through circumstantial evidence such as the nature of the wounds, opinions of declarant's physicians,* the fact that declarant received last rites, and statements made in declarant's presence")(emphasis added); *see, e.g., Mattox v. United States,* 146 U.S. 140, 151–52, 13 S.Ct. 50, 54, 36 L.Ed. 917 (1892) (sense of impending death may be inferred "from the nature and extent of the wounds inflicted being obviously such that he must have felt or known that he could not survive"); *United States v. Peppers,* 302 F.3d 120, 138 (3d Cir.), *cert.*

On one hand, if the trial court recognized that such circumstantial evidence could support a finding that Mrs. Tharpar believed her death was impending, but was simply not persuaded that the proffered evidence did so, then the court applied the correct legal standard. On the other hand, if the court believed that, in addition to circumstantial evidence regarding the grievous nature of Mrs. Tharpar's wounds and her physical and mental condition, the defense had to offer direct evidence, such as, for example, a statement that she knew she was dying, as in *Jones*, or requests for last rites and that others take care of her family, as in *Connor*, then the court's ruling was tainted by its failure to recognize that such direct evidence was not necessary. *See, e.g., United States v. Peppers*, 302 F.3d 120, 138–39 (3d Cir.), *cert. denied*, 537 U.S. 1062, 123 S.Ct. 647, 154 L.Ed.2d 548 (2002)(recognizing analogous lack of clarity in trial court's ruling excluding exculpatory dying declaration).

Our concern about the basis for the trial court's ruling is heightened by the court's failure to consider the proffered written statements by police who were with the victim between the time she was discovered and the time she died. There were a number of witnesses who detailed her fatal head injuries, her copious bleeding, and her pain. We can only speculate whether this additional evidence would have tipped the evidentiary scales in favor of admissibility, because the court apparently did not review it.

Given the need for a new trial in this case, however, and that the admissibility of these statements may be raised and decided anew at retrial, we raise these concerns only prospectively. For the reasons we have discussed, we anticipate a thorough consideration of all the proffered direct and circumstantial evidence bearing on whether Mrs. Tharpar believed

---

*denied*, 537 U.S. 1062, 123 S.Ct. 647, 154 L.Ed.2d 548 (2002) (in determining whether declarant believed that death was imminent, "it is clearly not only permissible, but indeed necessary, consistent with our caselaw, that the trial judge draw and rely on inferences from the facts of record, including the type of wounds inflicted and the nature of the declarant's injuries").

her death was imminent when she described her assailant, as well as a clearly stated explanation for any *in limine* ruling on this evidence. *See, e.g., United States v. Peppers,* 302 F.3d at 139 ("the issue may be raised anew at retrial, and on remand the [trial court] should revisit this ruling if [it] misapprehended the evidence it should consider").[17]

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**

ADKINS, J., filed an opinion concurring and dissenting, joined by DAVIS, HOLLANDER, SALMON, SONNER and WENNER, JJ.

ADKINS, Judge, concurring and dissenting.

I concur in the majority's decision to reverse Perez's convictions, but write separately to disagree with its rationale and with its conclusion that the 12, 15, and 37 hour presentment delays preceding Perez's statements might have been necessary.

### Majority's Rationale For Reversing

I cannot join in the majority's conclusion that reversal is required only because "the *Williams* Court ... articulated a standard for how to assess a deliberate violation of the presentment rule[.]" In my view, that holding does not follow the Court of Appeals' decision in *Williams v. State,* 375 Md. 404, 825 A.2d 1078 (2003). For the reasons set forth in this section, I disagree with the majority's rationale for its decision. As set forth in the following section, I concur that *Williams* requires reversal, but for the same reason cited by the *Williams* Court—because the suppression court did not

---

**17.** While not raised by the parties, and recognizing that the evidence may not support it, consideration should be given to whether the excited utterance exception to the hearsay rule applies.

indicate that it was giving heavy weight to unnecessary delay that preceded Perez's statements.

The holding in *Williams* cannot be reconciled with the majority's decision to reverse so that the trial court can decide whether, in light of *Williams,* to admit Perez's statements without giving them heavy weight. The *Williams* Court reversed three murder convictions, but significantly did not hold that the admissibility of the challenged confessions should be reconsidered on retrial. Instead, the *Williams* Court unanimously concluded that the suppression court erred by failing to give heavy weight to the unnecessary delay preceding Williams' three statements; the Court then held that the challenged statements must be excluded. *See id.* at 416, 825 A.2d 1078 (when Court of Appeals gave unnecessary delay preceding murder statements heavy weight, "it becomes clear that those statements were involuntary and therefore inadmissible"). This holding is inconsistent with the majority's view that *Williams* necessitates only a new suppression hearing at which the trial court could find the delay preceding Perez's statements was necessary and need not be given heavy weight. The *Williams* Court rejected, as a matter of law, the possibility that this delay could be found necessary. In my view, we must do the same in this case.

The majority's rationale rests on its concern that the Circuit Court for Prince George's County needs an opportunity to decide whether, under *Williams,* the prompt presentment rule was violated by Perez's lengthy presentment delay. Yet the *Williams* Court emphasized that Maryland courts, like "nearly all courts[,]" have long held that delaying presentment to obtain a confession is a violation of the prompt presentment rule that weighs against a finding of voluntariness. *See Williams,* 375 Md. at 424, 825 A.2d 1078 (citing federal and Court of Special Appeals cases); *Young v. State,* 68 Md.App. 121, 134, 510 A.2d 599 (1986); *Meyer v. State,* 43 Md.App. 427, 434, 406 A.2d 427 (1979). The majority, curiously, does not mention this precedent, or the Court of Appeals' rationale for giving this species of presentment delay heavy weight. The *Williams* Court stated that prompt presentment is "designed

to provide the defendant with a clear explanation of more basic Constitutional and statutory rights." *Williams*, 375 Md. at 430, 825 A.2d 1078. The reason that a violation of that right "must be given special weight in determining voluntariness is that, when the right it is designed to protect is transgressed, there may be no practical way of calculating the actual effect of the transgression." *Id.*

That rationale reflects the longstanding judicial recognition that, when a person accused of a crime is not afforded the constitutional and statutory protections given during presentment before a district court commissioner, it may never be possible to determine whether that suspect, "had he been presented timely to a Commissioner, . . . would have acquiesced in . . . [subsequent] interrogations and confessed to . . . murders[.]" *Id.* at 431, 825 A.2d 1078. When an arrestee confesses as a result of police interrogation conducted without counsel and before the initial appearance, any "judicial caution" regarding the value of defense counsel in avoiding self-incrimination has "lost its purpose[.]" *See Mallory v. United States*, 354 U.S. 449, 455, 77 S.Ct. 1356, 1360, 1 L.Ed.2d 1479 (1957); *see also Williams*, 375 Md. at 424, 825 A.2d 1078 (citing *Mallory* for the proposition that "nearly all courts agree" that the purpose of obtaining incriminating statements is "not a proper basis upon which to delay presentment"); *Johnson v. State*, 282 Md. 314, 321–22, 384 A.2d 709 (1978) ("In Maryland, as elsewhere," two of the important functions of the prompt presentment rule are to ensure that the accused will be promptly advised of right to counsel and of "due process right to be free from coercive investigatory methods").

The *Williams* Court recognized that presentment delays for the sole purpose of obtaining incriminating statements are, by their very nature, both deliberate and unnecessary, and reviewed why such delays are given heavy weight in the voluntariness calculus. When the Court of Appeals has held specifically that a new suppression hearing was not necessary to determine that a presentment delay for the sole purpose of interrogation should be weighed heavily against a finding of voluntariness, *see id.* at 433, 825 A.2d 1078, we cannot disre-

gard that holding. As the *Williams* Court pointed out in its conclusion, "the notion that [such] a confession . . . is under a cloud of suspicion contravenes neither logic[,] nor practical human experience," nor existing jurisprudence. *See id.* at 434, 825 A.2d 1078. I would hold, for the reasons discussed below, that the delay preceding all of Perez's confessions was unnecessary because it was solely for the purpose of obtaining incriminating statements, and that reversal is required because the suppression court failed to indicate that it was giving this unnecessary delay the heavy weight that it merits in this case.

### Unnecessary Delay Rationale For Reversing

The majority directs "[t]he suppression court, on remand, [to] conduct a new hearing and make a determination regarding whether there was unnecessary delay for the deliberate and sole purpose of obtaining a confession[.]" Implicit in that holding is the prospect that the delay preceding all three of the challenged statements might have been necessary. As noted above, I believe that this conclusion fails to apply the holdings of *Williams* and *Hiligh*.

I submit that, to be consistent with *Williams* and *Hiligh*, we must hold as a matter of law that the patent reason that the police did not take Perez "down the hall" to the available commissioner was that they wanted to obtain incriminating statements from him before doing so. What the majority opinion omits is that detectives who testified for the State during the three day suppression hearing admitted that they continued to interview Perez despite his initial denials of involvement, and even after he admitted some knowledge and involvement, because they were not satisfied with his previous statements:

● Detectives Hoffman and Turner testified that they accused Perez of being involved in the murder during the first forty minute interview that began less than an hour after Perez's arrest, at 1:00 a.m. on August 9. Perez denied any knowledge or involvement.

- They left Perez alone from 1:40 to 2:20 a.m., then returned and, in Turner's words, "fished for information" by telling Perez that Gordon said he was the shooter. That second interview lasted 80 minutes, until approximately 3:45 a.m. But Perez continued to deny any knowledge or involvement.

- During the next hour, detectives left Perez alone while they conferred with each other in an adjacent room "about what was going on in the interview."

- Detective Turner explained that he returned alone to interview Perez from 4:40 to 5:50 a.m. because he thought Perez was being evasive in his comments regarding the murders. Although Perez continued to deny any knowledge or involvement, Turner "didn't take it" as an indication "that he did not want to answer any questions about that," but rather, as an indication "that he didn't want to implicate himself any more than he already had."

- At 7:25 a.m. on August 9, because Perez was still denying any knowledge or involvement, Detective Rhone was "assigned to go in and talk to Mr. Perez about any information he had ... about the murder[s]." Although he did not know when Perez had arrived at CID, Rhone continued to interview Perez "one on one" over the next seven hours, with only bathroom breaks. Rhone began by getting biographical information in order to build "rapport with him and so he would understand who I was and what I needed out of the interview." Perez continued to deny any knowledge or involvement. It was 10:15 a.m., nearly three hours after Rhone began to interview Perez and 10 hours after his arrest, before Perez even admitted having seen Gordon with a gun. It was approximately two hours later—12 hours after Perez's arrest—that he began his first written statement.

- After Perez completed that statement at 2:00 p.m., there was a break in the interview, during which detectives discussed the new information. Not satisfied with Perez's first statement, Rhone reentered at 2:58 p.m. and obtained another *Miranda* waiver and a second statement.

- After Perez completed his second written statement at 5:01 p.m., Hoffman asked Detective Canales to conduct a voice stress test. That was complete at 8:10 p.m.

- Rhone returned again sometime during the morning of August 10 because the detectives wanted to talk to Perez about their theory, based on the autopsy, that "it could not have been ... one person that committed this incident, because one weapon was a knife and one weapon was a gun." He again asked Perez about his involvement in the murders, based on the autopsy, what had been learned from Gordon, and the results of Perez's voice stress test.

*Williams* and *Hiligh* dictate that we hold as a matter of law that this evidence from the detectives who interviewed Perez conclusively established that the sole reason for delaying Perez's presentment was to obtain incriminating statements from him. Like Williams, Perez initially denied participating in the murders, but Prince George's County detectives refused to accept his exculpatory statements and continued their questioning while consulting with each other regarding the results of the interviews as they continued in progress. Both cases feature "in and out" sequential interviews by different officers over a lengthy period of time, during which the suspect was confined, except for bathroom breaks, to an 8 or 9 foot square room with a single locked door with a peephole and no windows. Indeed, while Williams denied involvement in the murders for only two hours after the police began to question him about those crimes, Perez denied any involvement in the Tharpar murders for more than ten hours.

Although the majority correctly observes that determining why the police delayed presentment of Perez involves first level factual findings, it notably does not suggest that there is any evidence in this suppression record to support a finding that the police had some "necessary" reason for delaying Perez's presentment. Appellate courts routinely review suppression records to determine whether there is sufficient evidence to support the suppression court's factual findings and whether, in light of that evidence, the court's legal conclu-

sion was correct. *See, e.g., Scott v. State,* 366 Md. 121, 147, 782 A.2d 862 (2001), *cert. denied,* 535 U.S. 940, 122 S.Ct. 1324, 152 L.Ed.2d 231 (2002)("We review the [suppression] court's factual findings in the light most favorable to the State, pursuant to a clear error standard, but we review the legal conclusions *de novo*"); *Ferris v. State,* 355 Md. 356, 374–75, 377–79, 735 A.2d 491 (1999)(relying on suppression record to hold that suppression court erred in finding that police had articulable suspicion for continuing detention of motorist after purpose for traffic stop was accomplished). Thus, even if we were to rely on the presumption that courts properly apply the law to fill in the blank created by the suppression court's silence about why the police delayed Perez's presentment for more than two days after his arrest, and, thus, to conclude that the court found that there was some other reason than to obtain inculpatory statements from him, we still must review the evidence adduced at the suppression hearing to determine whether it could have supported such a finding. I respectfully submit that there is no evidence in this suppression record upon which any court could conclude that there was some other reason for delaying Perez's presentment.

It is especially significant that the State has not disputed that the purpose for this presentment delay was to question Perez. The State has never advanced, in the trial court or on appeal, any administrative reason for delaying Perez's presentment. Nor has it argued that the questioning was necessary to preserve evanescent evidence, to protect lives or property, or to apprehend Perez's alleged accomplice, who was already jailed. Although it initially argued that delay for this type of questioning was necessary and, in any event, of no discernable effect on the voluntariness of Perez's statements, after *Williams* and *Hiligh*, the State did not suggest that the delay was for some reason other than to interrogate Perez. Nor did it specifically argue that the delay was necessary.

In my view, the suppression record created by the State makes it clear that Perez's presentment delay was more "unnecessary" than the delays preceding the statements in

*Williams.*[18] *Cf. Williams,* 375 Md. at 424–25, 825 A.2d 1078 (immediate availability of commissioner made "[t]he entire delay" after police obtained defendant's statements about robberies unnecessary); *cf. also Hiligh,* 375 Md. at 473, 825 A.2d 1108 (delay after police obtained all information and completed all administrative work necessary to charge defendant, "as a matter of both law and fact, was unnecessary"). In particular, I note the following, which the majority does not consider in its opinion:

- Williams was 19 years old when he arrested and interrogated. 17 year old Perez was two years younger, still living as a minor in his parents' care.

- In contrast to *Williams,* in which part of the delay was attributable to uncertainty about Williams' possible involvement in the murders, no part of the delay here can be attributed to uncertainty about Perez's possible involvement in the murders. Williams was arrested without a warrant on suspicion of an unrelated robbery that occurred only hours earlier, without any suspicion that he might be involved in the murders to which he eventually confessed. But Perez was arrested on a warrant for possible involvement in the nine month old murders to which he confessed. *Cf. also Hiligh v. State,* 375 Md. 456, 461, 825 A.2d 1108 (2003) (police obtained photo identification before deciding to charge).

- Similarly, while some of the delay in *Williams* and *Hiligh* might be attributed to uncertainty about the identity of the person arrested, none of the delay here can be attributed to uncertainty about Perez's identity.

---

18. Williams was arrested at 4:10 a.m., and placed into an interview room at 9:25 a.m. His three written statements regarding the murders were made at 7:40 p.m. on July 30 (15.5 hours after arrest, 10.25 hours after interrogation began, and 6.5 hours after Williams completed his statements about the robbery); 9:58 p.m. on July 30 (17.75 hours after arrest, 12.5 hours after interrogation began, and 8.75 hours after the robbery statements were complete); and 4:08 p.m. on July 31 (more than 34 hours after arrest, 28 hours after interrogation began, and 25 hours after the robbery statements were complete). *See Williams v. State,* 375 Md. 404, 408, 423–24, 825 A.2d 1078 (2003).

Williams' true identity was not confirmed for nearly seven hours after his arrest. In contrast, Perez's identity was confirmed **before** his arrest.

- In further contrast to *Williams,* none of the delay here is attributable to investigation of other crimes. Williams was questioned about the robberies that precipitated his arrest, during the first nine hours after his arrest; he quickly confessed to those crimes when the police legitimately questioned him in an effort to ascertain "basic information about their suspect and . . . about his involvement in the two robberies, so that he could be identified and charged." *Williams,* 375 Md. at 423, 825 A.2d 1078. In contrast, detectives testified that they had enough information against Perez to obtain an arrest warrant and that they accused Perez of involvement in the Tharpar murders during their first interview, which began only an hour after his arrest.

- To an even greater degree than in *Williams,* the effect of Perez's presentment delay was exacerbated by overnight confinement in a small interview room. While Williams was **left to sleep** in the interrogation room during a **single** "midnight to morning" period; Perez was **questioned** during **two** consecutive "overnighters." Perez was left to sleep only intermittently between questioning sessions; he gave his first and second statements after the first overnighter and his third statement after the second.

Perez's case presents an even clearer instance than *Williams* of deliberate and unnecessary delay for the purpose of obtaining confessions. This is the specific type of presentment delay that, according to the Court of Appeals, Rule 4–212 "absolutely forbids." *See Hiligh,* 375 Md. at 473, 825 A.2d 1108. *Williams* and *Hiligh,* like this case, address only this particular "species" of presentment delay, not the broader "genus" of delays that occur for other reasons, with which the majority appears to be concerned. Once the Court of Appeals decides a question of Maryland law, we must follow and apply

its ruling. The **least** that *Williams* and *Hiligh* require us to conclude is that the 12, 15, and 37 hour presentment delays before Perez made his statements were unnecessary and, thus, were entitled to heavy weight.[19]

The court did not decide that these delays were unnecessary, nor did it indicate that it was giving **any** weight to such delays. The court's terse reference to "the totality of the circumstances," in its single-sentence bench ruling at the end of the three day suppression hearing, makes no mention of delay. Given the significant presentment delay established by this record, and defense counsel's emphasis on it as grounds for suppression,[20] I cannot conclude from mere silence that the court properly weighed this delay when it decided that all of

---

19. I do not view *Facon v. State*, 375 Md. 435, 825 A.2d 1096 (2003), as authority to send Perez's statements back to circuit court without addressing whether there was unnecessary delay in presentment. *Facon* involved a materially different presentment delay scenario and reason for reversal than presented by the *Williams* case or this case. The presentment delay in *Facon* included the time between Facon's arrest in the District of Columbia and his arrival in Prince George's County. The Court of Appeals reversed because, although the 24 hour "clock" in Rule 4–212 did not start during this time period, the circuit court was obligated to consider how the entire delay between arrest and presentment affected Facon, and to consider more than just the time spent in actual interrogation, in deciding whether his statement was voluntary. *See id.* at 453–54, 825 A.2d 1096. Here, there is no analogous delay due to jurisdictional transfer, and thus, no need to consider how such delay affected the voluntariness of the challenged statements.

20. At the suppression hearing, defense counsel argued that the circumstances of Perez's 48 hours of pre-charging detention and interrogation raised "red flag[s]" indicating that all three of his statements were involuntary. Counsel reviewed in detail the course of events at CID, then asked rhetorically,

> Why don't you take him to the commissioner? . . . [T]hey are not satisfied with anything. So, we are going to keep pounding away, and we are going to get past this 24 hour requirement by having him sign a waiver. . . .
>
> I would submit to the Court that on the issue of voluntariness that these statements became involuntary because of the way that things were conducted. The police knew that they had problems. This [forty-eight] hour time is a red flag. The two Johnson waivers are a red flag that you can't get around.

Perez's statements were voluntary. *See Williams,* 375 Md. at 434, 825 A.2d 1078.

It is especially significant that the suppression court did not discuss each of Perez's three statements separately. In *Lodowski v. State,* 307 Md. 233, 253, 256–58, 513 A.2d 299, the Court of Appeals held that the suppression court was obligated to determine whether each of three challenged statements was voluntary by considering the circumstances in which each one was made, and that its failure to do so required a new trial. On a record such as this, the suppression court should have scrutinized the evolving circumstances in which Perez made each statement to determine if each met the test of voluntariness. *See Williams,* 375 Md. at 431–32, 825 A.2d 1078; *Hiligh,* 375 Md. at 474–75, 825 A.2d 1108. Unlike the majority, which rests its decision to reverse on a rationale that is inconsistent with the holding in *Williams,* I would reverse, under the precedent established by *Williams, Hiligh, Facon,* and *Lodowski,* because the suppression court failed to indicate that it had considered the circumstances surrounding each challenged statement, including the heavy weight of the unnecessary presentment delay.

### Waiver

With respect to the effect of the two "commissioner's waivers" that Perez signed, I cannot join in the majority's suggestion that a *Miranda* waiver that does not include any reference to a suspect's right to prompt presentment might operate as a waiver of that right. Again, I believe that would not be consistent with *Williams.*

The *Williams* Court cited the effective use of *Miranda* rights waivers as precedent for the police to advise suspects in an analogous manner of their right to prompt presentment and to obtain a written waiver of that right.

The same approach can easily and effectively be used with respect to the right to prompt presentment for an accused detained pursuant to an arrest. **It would be a simple matter for the police to advise the accused as well of his or her right to prompt presentment before a**

> **District Court Commissioner,** that the Commissioner is a judicial officer not connected with the police, and that the Commissioner, among other things, will inform the accused of each offense with which he or she is charged, including the allowable penalties attached to those charges, furnish the accused with a written copy of the charges, advise the accused of his or her right to counsel, make a pre-trial release determination, and if ... the accused has been charged with a felony beyond the jurisdiction of the District Court, of his or her right to a preliminary hearing before a judge. The police could inform the defendant that he or she may waive that right of prompt presentment and agree to submit to interrogation, subject to the right to end the interrogation at any time and demand to be taken promptly before a Commissioner.

*Williams,* 375 Md. at 432, 825 A.2d 1078 (emphasis added).

The *Williams* Court recognized, however, that prompt presentment waivers, like *Miranda* waivers, can be effective only if given **before** an unnecessary delay yields an inculpatory statement. *See id.* at 432–33, 825 A.2d 1078 (suggesting that presentment waiver practice could be modeled on established practice of obtaining a *Miranda* waiver "[t]hat helps to establish that **any statement made thereafter** is voluntary")(emphasis added). Here, the State asserted that Perez's first two statements were made 12 and 15 hours after arrest. Prince George's County detectives testified, however, that Perez was not advised of his right to prompt presentment or presented with these waiver forms until after he had been at the station for approximately 24 hours.[21] For that reason, the waivers here did not provide *post hoc* "coverage" for Perez's first two statements. A confession obtained during an unnecessary

---

21. The record does not support the majority's uncertainty about "whether Perez was orally advised of his right to prompt presentment other than when he executed written waivers[.]" Detective Hoffman's testimony makes it clear that, when he prepared and presented the "commissioner's waiver" form approximately 24 hours after Perez's arrest, Perez had not yet been advised of his right to prompt presentment.

presentment delay for interrogation cannot be "cured" after the fact by either a subsequent presentment or a subsequent waiver of the right to presentment. The waivers executed by Perez carry no weight in determining the admissibility of the first two statements by Perez.

Perez's third statement, begun after 37 hours of custodial interrogation, followed not one, but two, waivers. But the *Williams* Court caveated that any

**delay in presentment, even with a waiver, must be reasonable.** The Rule already sets 24 hours as an outside limit for presentment, and, **absent some truly extraordinary circumstance,** we would not expect any delay incurred for purposes of interrogation to extend beyond that time period.

*Id.* at 433 n. 4, 825 A.2d 1078 (emphasis added).

The suppression court did not address whether it found "truly extraordinary circumstances" justifying the 37 hour delay preceding the third statement. I see none argued by the State and none contemplated by the majority. In the absence of any evidence of extraordinary circumstances explaining why Perez was not taken to the commissioner during those 37 hours, I would hold, in accordance with *Williams,* that the two waivers, by themselves, cannot excuse the delay preceding the third statement.

### Jury Instructions

Although I agree with the majority's concern that courts should refrain from giving any instruction that may suggest to the jury that the State has a 24 hour "safe harbor" to question suspects, I see little risk in telling the jury about the 24 hour guideline, even in cases in which the presentment delay was less than 24 hours. It would be a simple matter to instruct the jury, as the majority recognizes, that "the State is not automatically entitled to 24 hours."

As for this case, which does involve a presentment delay in excess of 24 hours, I read both *Williams* and *Hiligh* as implicitly recognizing that, when asked, the trial court must instruct the jury that the law requires police to present an

accused to a judicial officer without unnecessary delay, which, except in unusual circumstances, is generally within 24 hours after arrest. That request was made by Perez's counsel. In my view, it was error for the trial court to deny defense counsel's request.

Just as an instruction about the special weight of deliberate and unnecessary delays supplies the jury with an important yardstick for determining whether a challenged statement was voluntary, so too, does an instruction regarding the 24 hour guideline. I agree with Perez that, with no guidance as to the meaning of "unnecessary delay," the jury may mistakenly fail to weigh such delays heavily against a voluntariness finding. *Cf. Hof v. State,* 337 Md. 581, 602, 655 A.2d 370 (1995)(instruction that failed to provide guidance as to how voluntariness determination is to be made was "wholly inadequate").

I am not persuaded by the State's contention that such an instruction would mislead the jury into believing that presentment within 24 hours is a "hard and fast rule." The State overstates that risk. The trial court can ensure that the jury understands that 24 hours is merely a guideline for evaluating whether a particular delay was necessary. Rather than telling the jury that presentment may "in no event" be delayed more than 24 hours, the court can say that presentment may not be unnecessarily delayed, and that delays in excess of 24 hours must be considered unnecessary unless there are extraordinary circumstances justifying that delay. I see no good reason to keep the jury in the dark about the 24 hour guideline. It exists for a good and simple reason—because the length of any deliberate delay in presentment should be justified by legitimate reasons for that delay.

The State's argument that cross-examination and argument by defense counsel adequately advised the jury of the requirements imposed under Rule 4–212 is not persuasive. The jury was instructed that counsel's argument and comments were **not** evidence. Moreover, the police detectives' testimony regarding the 24 hour guideline for presentment was equivocal at best. In fact, the detective who created, and got Perez to

sign, the so-called "Commissioner's waiver" forms notably told the jury that, in his five years as a homicide detective, he was not aware of any law requiring that Perez be taken to the district court commissioner within 24 hours.

Given that testimony, and the court's subsequent failure to tell the jury that police are required by law to take an accused to a district court commissioner without unnecessary delay, or to otherwise explain the 24 hour guideline, the jury might have concluded that there was no presentment requirement or no guideline. Perez had a legal right to have the court, rather than defense counsel, instruct the jury on law that was relevant to the voluntariness issues that were critical to his defense.

Finally, I also agree with Perez that, in his particular case, the jury might have considered such instructions in resolving the conflicting accounts of what happened during Perez's interrogation. For example, jurors might have found it significant that the police were aware of the prompt presentment obligation and of the 24 hour benchmark, in deciding whether Perez voluntarily made the statements 12, 15, and 37 hours after his arrest, as the police claimed, or whether he made those statements much later, in the hours just before he was taken to the commissioner, as Perez claimed.[22]

---

**22.** Perez's account of his two days of interrogation differed dramatically from the detectives' account. Perez testified that he wrote no statements until he had been in custody for two nights, and that he wrote all three over a period of several hours. His statements reflected what Detective Rhone told him to write. He signed all of the *Miranda* and commissioner waivers less than an hour before he was taken to the commissioner. He did so because the detectives told him to, even though he was not aware of their significance.

According to Perez, Detective Hoffman screamed at him, punched him, grabbed him by his shirt, and "yoked" him around to the point that his body hit the walls of the room. Hoffman also threatened him with the death penalty and promised that, if he confessed, he would be released and his charges would be reduced to burglary.

Perez also claimed that he repeatedly asked for an attorney, to no avail. He explained that he had been arrested before, and his previous requests for counsel had been honored. But "this time they assaulted me."