846 A.2d 445

**Robert Alan ODUM, Jr.**

v.

**STATE of Maryland.**

**No. 0953, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

April 7, 2004.

Peter F. Rose (Stephen E. Harris, Public Defender on the brief), Baltimore, for Appellant.

Diane E. Keller (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for Appellee.

Panel: MURPHY, C.J., LAWRENCE F. RODOWSKY (retired, specially assigned) and JAMES S. GETTY (retired, specially assigned), JJ.

LAWRENCE F. RODOWSKY, Judge, retired, specially assigned.

A Prince George's County grand jury indicted the appellant, Robert Alan Odum, Jr. (Odum), on two counts of murder, of robbery with a deadly weapon, of kidnapping, and of using a handgun in a crime of violence, as well as on single counts of armed carjacking and conspiracy to commit murder. The theory of the State's case was that Odum participated with four other persons in committing these offenses involving two victims. A jury found Odum guilty on both kidnapping charges. He was sentenced to thirty years confinement for each offense, with the sentences to run consecutively. In this appeal Odum challenges the sufficiency of the evidence, the voluntariness of his statement, the admissibility of certain evidence, and the propriety of the prosecutor's closing argument. As explained below, because of the absence of specific factual findings necessary to determine the weight to be afforded the delay in presenting Odum before a Commissioner in the voluntariness analysis, we vacate and remand for a new suppression hearing and a new trial.

Odum's alleged four co-felons were Aaron Hollingsworth (Hollingsworth), Eric Thomas (Thomas), Marco Scutchings, also known as Marco Butler or Marco Scutchings–Butler (Butler), and Cortez Carroll (Carroll). All five subjects lived in the same general neighborhood in the Fort Washington area of Prince George's County. Odum had known Hollingsworth, Thomas, and Carroll for approximately ten years and had known Butler for approximately two years. At the time

of the offenses charged, Sunday, June 10, 2001, Odum was twenty-three years of age, married, and the father of an infant daughter. He has a G.E.D. His friends were, respectively, aged nineteen, twenty-two, eighteen, and twenty.

On Saturday night, June 9, 2001, there was a large party in the neighborhood, at which some of the guests, including Odum and Hollingsworth, consumed alcoholic beverages and smoked marijuana. When the party broke up about midnight, the five fell in together, smoking marijuana cigarettes while walking on Lampton Lane toward the Fort Washington United Methodist Church (the Church). The Church's property faces on Lampton Lane, which is its western boundary, and is bounded on the south by Old Fort Road and on the east by Indian Head Highway. The Church's parking lot, which was not illuminated in the middle of the night of June 9–10, lies south of the church building. Between the parking lot and Old Fort Road is a driveway into the parking lot and a lawn area landscaped with bushes.

At trial, the principal proof of Odum's participation was in the testimony of Hollingsworth, who had plea bargained with the State, and in Odum's statement. Odum did not testify at trial.

Also on Saturday night, June 9, the victims, Michael Eugene Patten (Patten), age twenty-nine, and Lea Ann Brown (Brown), age twenty-four, together with friends, had been patronizing Lulu's nightclub in Washington, D.C. Patten was employed by Riggs Bank in Waldorf, Maryland, where he lived. Since childhood, Patten had been a member of the Church congregation. Brown was a yeoman third-class petty officer in the United States Navy, assigned to general administrative duties at the Washington Naval Yard. Patten and Brown left Lulu's together about 2:30 a.m. on June 10. Patten was driving his 1990 Acura Legend.

Meanwhile, when the five subjects had arrived at the Church, Thomas announced that he was going to find someone to rob, and he separated himself from the others in order to stand along the west side of Indian Head Highway, north of its intersection with Old Fort Road. Hollingsworth, Butler,

and Carroll remained on the Church property near the driveway into the parking lot. In his statement Odum said that he crossed to the south side of Old Fort Road and sat on a pile of rocks west of Indian Head Highway. Sometime near 3:00 a.m. Patten drove the Acura into the Church parking lot and stopped in the parking row nearest the church building. Brown stepped out from the passenger side and urinated.

One of the five subjects, who had a handgun, went up to the driver's side of the car and ordered Patten to get out. Hollingsworth took thirty dollars from Patten's pocket. Other subjects were on the passenger side of the car, asking Brown for money. Carroll went through Brown's purse and found her ATM card. Brown yelled out her PIN number. When Patten started to go to the passenger's side of the car, Hollingsworth beat Patten with his fists and, after Patten fell to the ground, Hollingsworth stepped on his neck to prevent him from getting back up. Someone in the group said, " 'Put them in the trunk[.]' "

Hollingsworth, with the assistance of either Odum or Butler, put Patten, who was unconscious, into the Acura's trunk. Brown was ordered into the trunk, where Hollingsworth pushed her head down, and Carroll struck her in the head with a pistol when she popped her head back up. The trunk lid was slammed shut on the victims, and all five subjects drove off in Patten's car. Thomas was driving, with Odum in the front right passenger seat.[1] Carroll, Hollingsworth, and Butler were seated in the rear.

The five subjects transported the victims to a secluded, wooded area in Accokeek. The victims were taken from the trunk. Patten was shot twice in the back of the head and once in the upper back.[2] Carroll shot Brown twice in the neck.

---

**1.** In his statement Odum admits that he drove off with the others, stating that he went along due to fear. The statement is vague, at best, on what caused Odum to leave his allegedly disassociated position on the far side of Old Fort Road.

**2.** In his statement Odum says that Hollingsworth took Butler's gun from Butler and shot Patten. Hollingsworth testified that he walked

The five subjects got back into the Acura. Thomas initially took the wheel, but he swerved off the road, almost hitting trees. At that point Odum took over driving, with Thomas in the front passenger seat. (Odum's fingerprint was found on the interior rearview mirror of the Acura). At some point on the drive either to or from Accokeek, Hollingsworth gave five dollars to each of the other four from the money that he had taken from Patten. Odum drove the group to a location in southeast Washington, D.C. in order to buy marijuana. Hollingsworth made the purchase, after collecting back from each of the other four the five dollars that he had distributed previously to each of them. Odum then drove the band to a gasoline station where they bought blunts into which they rolled the marijuana for smoking.

Odum next drove the group to Eighth and H Streets in northeast Washington where one of them used Brown's ATM card to withdraw twenty dollars. Odum then drove the group back home to Fort Washington. Hollingsworth was the first to be dropped off, at his house.

The victims' bodies were found on the afternoon of June 10. As a result of a tip from a citizen, the Acura was found several days later, abandoned in a residential neighborhood.

Additional facts will be stated in the discussion of the particular issues raised by Odum on this appeal. Those issues, which we have reordered, are:

"[1] Whether the evidence was insufficient to sustain the convictions[;]

"[2] Whether the trial court erred in refusing to suppress Mr. Odum's statements as involuntary[;]

"[3] Whether the trial court erred in admitting evidence regarding the alleged murder weapon[;]

"[4] Whether the trial court erred in admitting the autopsy photographs[; and]

"[5] Whether the trial court erred in failing to grant the motion for a new trial."

---

away from the group at Accokeek and heard the shots, but that he did not know who shot Patten.

## I. Evidentiary Sufficiency

■ Odum contends that the evidence was insufficient to support a verdict of guilty of kidnapping. This argument is based on the way in which Hollingsworth testified. He repeatedly referred generally to his "co-defendants," or the "others," but, with one possible exception, he did not describe Odum as acting affirmatively until Odum began driving the Acura. Odum submits that mere presence is insufficient to establish guilt as a principal in the second degree and that, at best, the State proved Odum to have been an accomplice after the fact. Thus, says Odum, citing *Osborne v. State,* 304 Md. 323, 499 A.2d 170 (1985), *overruled on other grounds by State v. Hawkins,* 326 Md. 270, 604 A.2d 489 (1992), the maximum sentence that could have been imposed on him for each of the two kidnapping convictions was five years imprisonment. Odum's argument fails on Hollingsworth's testimony alone, even though we could consider Odum's statement as well on this issue. *See Lockhart v. Nelson,* 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988).

■ A person may be guilty of a felony, as a principal in the second degree, by aiding, counseling, commanding, or encouraging, either actually or constructively, the commission of the felony in the person's presence. *State v. Hawkins,* 326 Md. 270, 280, 604 A.2d 489, 494–95 (1992); *State v. Ward,* 284 Md. 189, 197, 396 A.2d 1041, 1046–47 (1978).

Hollingsworth was unsure whether Odum or Butler assisted Hollingsworth in putting Patten into the trunk, but the ambiguity is immaterial. Of significance is that either Butler or Odum could have assisted in moving Patten's unconscious body because both were present and participating generally.

In addition, after the victims had been placed in the trunk of the Acura, Carroll, Hollingsworth, and Butler jammed themselves into the back seat of the car and left the front passenger seat for Odum. From this the jury could infer that the other subjects recognized Odum as a participant who would join in the escape from the initial crime scene and in transporting the victims.

Odum's five dollar share in the fruits of the robbery of Patten also demonstrates that he was present, aiding and abetting. In *McCullers v. State,* 233 Md. 202, 195 A.2d 727 (1963), a vehicle occupied by a driver and two passengers, one of whom was McCullers, entered a service station. Another passenger, one Williams, went into the station office and stole money. The driver drove off without Williams, but picked him up one block away. In a statement given to the police, McCullers admitted that Williams had stolen the money and that he, McCullers, had received part of it. Later, McCullers denied any knowledge that Williams intended to steal and asserted that the money he had received from Williams was in payment of a debt. The Court of Appeals held that there was sufficient evidence from which the trier of fact fairly could find McCullers's guilt of larceny beyond a reasonable doubt.

There was sufficient evidence that Odum aided and abetted the two kidnappings, even without relying on Odum's statement.

## II. Suppression

Odum moved to suppress his statement as involuntary. At the suppression hearing he testified that his waiver of *Miranda* rights was obtained by a detective who choked him in order to induce the waiver. He further testified that other police officers promised him favorable bail treatment if he gave a statement. The officers involved denied, specifically and generally, the use of force, threats, or inducements. The court believed the testimony of the police officers.

Odum's motion also submitted "that such statement was taken after he was deprived of his right to prompt present-ment before the Commissioner, pursuant to Maryland Law." At the suppression hearing, Odum argued that the delay of more than thirty hours in taking him before a Commissioner must be "weighed heavily against the State." [3] In rejecting the motion to suppress, the circuit court's ruling from the

3. Odum's argument for special weight was made in the following context:

bench does not reflect consideration of whether any special weight should be given to any part of the delay.[4]

After this case initially was argued, but before its decision, the Court of Appeals, on June 13, 2003, decided three cases involving the effect on voluntariness of an unnecessary delay in presentment. *See Williams v. State,* 375 Md. 404, 825 A.2d 1078; *Facon v. State,* 375 Md. 435, 825 A.2d 1096; and *Hiligh v. State,* 375 Md. 456, 825 A.2d 1108. We directed the parties to reargue Odum's involuntariness contention in the light of these decisions, the rule of which applies to cases tried before the decisions were rendered. *See Perez v. State,* 155 Md.App. 1, 27, 841 A.2d 372, 387 (2004).

The record at the suppression hearing reveals the following facts most favorable to the State. *See Rowe v. State,* 363 Md.

---

"The State's testimony is that the Defendant was seventy-five yards from the Commissioner's Office, and could have been taken at any time during that twenty-four hours, but was not. And accept everything the State says, he wasn't questioned for fourteen hours from 11:37 until, approximately, 2:00 o'clock, approximately fourteen hours, and then he was; that went on for two hours.... When was the Defendant taken before the Commissioner? Without doubt, with no debate, thirty-one hours after he was arrested. That is of[ ] constitutional dimension; violative of the rules, and then we have to implicate or bring the Court and judicial proceedings and weigh that as one of the factors. I would submit it has to be weighed heavily against the State."

4. The court's ruling was as follows:
"In making this determination, the Court underwent all of the thought process behind the length of time that he was within the physical custody of law enforcement authorities, all of the attendant circumstances that were testified to by all the parties, and the Court reviewed all of that in independent junction with my review of the cases of [*Young v. State,* 68 Md.App. 121, 134, 510 A.2d 599, 606, *cert. denied,* 307 Md. 599, 516 A.2d 569 (1986)] and the ones I earlier mentioned, and don't. find the facts and circumstances in this setting to be like the facts and circumstances in the *Young* case. He was left entirely alone for a huge period of time during the time period in which he was in custody. He was provided with food on occasion. He was provided with drink on occasion; coffee and cigarettes as well. He had opportunities to go to the bathroom, and he, in this Court's view, based on, again, the testimony presentations made, was afforded with all the rights that he should have been provided with during this process."

424, 431–32, 769 A.2d 879, 883 (2001). Odum was arrested at 11:00 a.m. on June 26, 2001, under a warrant charging him with armed robbery of a liquor store. He was taken to the Landover Station of the Prince George's County police. A Commissioner is available in that building twenty-four hours a day. At 11:37 a.m. Odum was placed in an interview room that measured as much as ten feet by fifteen feet and contained a desk and two chairs. At various times Odum was taken to the bathroom, and he was given food, coffee, sodas, and cigarettes. At no time during his stay in the interview room was Odum handcuffed.

Corporal Samuel Smith had investigated the liquor store robbery and obtained the warrant under which Odum was being held. On the day of the arrest Corporal Smith was at the courthouse in Upper Marlboro on another case. Advised by cell phone that Odum had been arrested, Corporal Smith asked "[t]o have him placed in an interview room, and to just check on him periodically until [Corporal Smith got] out of the courthouse." Odum was confined alone in the interview room, with the exception of a visit to the bathroom, until 5:40 p.m. when Corporal Smith entered. He told Odum of the liquor store robbery charges, took Polaroid pictures of him, and did not caution Odum under *Miranda*. Corporal Smith left the interview room at 6:30 p.m. At 6:52 p.m. Corporal Michael Delaney entered, advised Odum of his *Miranda* rights, and, in about "five minutes," obtained a written waiver of those rights.

Corporal Delaney was a homicide investigator who was principally dealing that evening with Carroll who, at some unspecified time, had been taken into custody. Indeed, at least four other persons from the Fort Washington neighborhood were in custody at the Landover Station on the night of June 26–27. Corporal Smith described Odum as yelling "LL" to the adjoining interview room. The officer interpreted this to mean Lampton Lane. That was one of the streets in Fort Washington abutting the Church.

Between 8:21 and 9:10 p.m. Corporal Smith and Detective Jackie Braudus, the lead investigator on the Patten and

Brown murders, photographed Odum's boots outside of the interview room. During that same period Corporal Smith asked Odum to state his whereabouts at the time of the liquor store robbery. Odum said he was in Virginia. Corporal Smith asked no other questions, and no statement was taken.

Odum remained confined alone in the interview room from 9:10 p.m. on June 26, 2001, to 1:00 a.m. on June 27, when Detective Ismael Canales (Canales), a homicide detective, entered. Canales said he was investigating the murder of two people in Accokeek, without specifying their race. Odum denied knowing anything about two "white" people being killed. There was general conversation about Odum's background. Canales told Odum that others were being interrogated concerning the Accokeek murders and that it would simply be a matter of time until one of the other subjects implicated Odum. Odum took the position that his trump card was that he would be the State's star witness if others implicated him. At about 2:00 a.m. Odum signed a second waiver of *Miranda* rights and, between 2:00 and 4:00 a.m., gave a written statement to Canales. In his statement Odum acknowledged his presence at the scenes of the kidnappings and murders, but he denied active participation. It is that statement for which suppression is sought in this appeal.

After giving his written statement, Odum remained confined in the interview room until 1:56 p.m. on June 27. The only interruptions to this confinement, other than for physical needs, were for the purpose of taking saliva and hair samples and for a brief interview at 10:57 a.m. In that interview Homicide Detectives Chris Smith and Glenn Clark showed Odum a photograph of Hollingsworth whom Odum identified as the subject who had shot Patten, thereby confirming what Odum had said in his written statement. At 1:56 p.m. he was taken to a holding cell near the Commissioner's hearing room and left in the custody of the Prince George's County Department of Corrections.

At 3:00 p.m. on June 27, Odum was served with a statement of charges, alleging that he had murdered Patten and Brown.

Service of those charges apparently was effected in the holding cell.

Odum appeared before the Commissioner at 6:12 p.m. that evening. Thus, approximately thirty and one-half hours elapsed between Odum's arrival at the Landover Station and his appearance before the Commissioner.

Maryland Rule 4–212(e) addresses the required procedure following the execution of an arrest warrant on a defendant who is not in custody. The rule in relevant part provides that "[t]he defendant shall be taken before a judicial officer of the District Court without unnecessary delay and in no event later than 24 hours after arrest[.]" Also relevant is Maryland Code (1974, 2002 Repl.Vol.), § 10–912 of the Courts and Judicial Proceedings Article (CJ), which provides:

"(a) ... A confession may not be excluded from evidence solely because the defendant was not taken before a judicial officer after arrest within any time period specified by Title 4 of the Maryland Rules.

"(b) ... Failure to strictly comply with the provisions of Title 4 of the Maryland Rules pertaining to taking a defendant before a judicial officer after arrest is only one factor, among others, to be considered by the court in deciding the voluntariness and admissibility of a confession."

The *Williams, Facon,* and *Hiligh* cases, *supra,* clarified the relationship between the rule and the statute as they affect voluntariness.

In *Williams* the defendant was arrested, without a warrant, at 4:10 a.m. on July 30, 2000, for two robberies. After a necessary delay for the hospital treatment of injuries sustained by Williams when the arrest was effected, Williams, still in his hospital gown, was placed in an interview room at 9:25 a.m. By 12:42 p.m. that same day Williams had waived his rights and given a written statement as to each of the robberies. During this period the police learned that Williams gave a false name when arrested and that there were warrants outstanding against him for three murders.

A homicide detective began interviewing Williams at 1:23 p.m. on July 30 concerning the murders. That detective was relieved by a second detective at around 6:30 p.m. By 9:57 p.m. Williams had completed a statement concerning one of the murders and by 12:13 a.m. on July 31, 2000, he had completed a statement concerning the other two murders. Thereafter he was left overnight in the eight foot by eight foot interview room to sleep on the floor. At 10:21 a.m. a third detective, who had reviewed the statements from the night before, interviewed Williams concerning the first murder and obtained the name of Williams's accomplice. Williams then was taken in a van on an unsuccessful search for the accomplice. At 1:04 p.m. he identified a photograph of the accomplice, and between 4:08 and 5:51 p.m. on the 31st he gave an additional statement concerning the first murder. Prosecution for that murder was the subject of the reported opinion. At 8:30 p.m. on the 31st he was taken to "District 3" for processing and was presented to the Commissioner at 3:07 a.m. on August 1.

Reviewing the history of CJ § 10–912 and Rule 4–212(e) and (f) (the latter dealing with the procedure following the execution of warrants on persons in custody), the Court of Appeals explained that CJ § 10–912 altered the rule of *Johnson v. State,* 282 Md. 314, 384 A.2d 709 (1978), and *McClain v. State,* 288 Md. 456, 419 A.2d 369 (1980), under which a violation of Rule 4–212, in and of itself, resulted in suppression of a statement. "The goal of the statute was simply to eliminate a Rule violation as an independent ground, separate from voluntariness, for rendering a confession inadmissible." *Williams,* 375 Md. at 429, 825 A.2d at 1092.

In *Williams,* the police "had all of the basic information they needed to present [Williams] to a Commissioner" on the two robbery charges by 12:42 p.m. on July 30, that is, in just over three hours after the interrogation had begun. *Id.* at 423, 825 A.2d at 1089. At that time the police could have taken Williams before a Commissioner on the robbery charges "and then returned him to the station for questioning as to the homicides." *Id.* (footnote omitted).

The *Williams* Court then considered whether the interrogation for the homicides was for an "appropriate," *i.e.*, necessary, purpose and held that it was not, saying:

> "There were no apparent administrative functions to be performed that required further questioning, and, to the extent there were any, it does not appear that the ensuing questioning was for that purpose. The homicides had been committed on July 21—nine days earlier. Petitioner had already been charged in at least one of them. There was no concern about possible harm to other people or property, and it does not appear that the police were focusing on the identity or location of other persons. Petitioner was not questioned about an accomplice until sometime after 10:21 a.m. on July 31, some 21 hours after the homicide interrogations began."

*Id.* at 424, 825 A.2d at 1089.

The Court concluded that "[t]he sole, unadulterated purpose of the subsequent interrogation was to obtain incriminating statements[ .]" *Id.* at 424, 825 A.2d at 1090. Citing *Young v. State,* 68 Md.App. 121, 134, 510 A.2d 599, 606, *cert. denied,* 307 Md. 599, 516 A.2d 569 (1986) (quoting *Meyer v. State,* 43 Md.App. 427, 434, 406 A.2d 427, 433 (1979)), the Court held that such a purpose was "not a proper basis upon which to delay presentment." *Williams,* 375 Md. at 424, 825 A.2d at 1090. Then, addressing the relationship to voluntariness of that type of "unnecessary" delay that has as its sole purpose an interrogation seeking incriminating statements, the Court said:

> "[I]f the police ... deliberately delay presentment in order to conduct a custodial interrogation, any resulting confession must be regarded as laden with suspicion. The violation of the Rule in such a circumstance will have to be given very heavy weight, by both the suppression court and by the trier of fact, in determining the overall voluntariness of the confession. Obviously, the longer any unlawful delay, the

greater is the weight that must be given to the prospect of coercion."

*Id.* at 433, 825 A.2d at 1095.

Summing up, the *Williams* Court concluded:

"We hold that any deliberate and unnecessary delay in presenting an accused before a District Court Commissioner, in violation of Rule 4–212(e) or (f) must be given very heavy weight in determining whether a resulting confession is voluntary, because that violation creates its own aura of suspicion. The violation does not, of itself, make the confession involuntary or inadmissible. It remains a factor to be considered, along with any others that may be relevant, but it must be given very heavy weight. There was such a violation here, and we are convinced from the record that the trial court did not give that violation the proper weight and did not instruct the jury to do so. It is for those reasons that we reverse."

*Id.* at 434, 825 A.2d at 1095. The Court remanded the *Williams* prosecution for a new trial.

In *Facon v. State,* 375 Md. 435, 825 A.2d 1096, the delay in presentment before a Commissioner, measured from the time when the accused was brought to the central processing facility in Prince George's County from Washington, D.C., was twelve and one-half hours. The Court of Appeals found that "[t]he delay was solely for the purpose of interrogation." *Id.* at 453, 825 A.2d at 1106. Under those circumstances, the accused was entitled to have the suppression court "accord such violation very heavy weight in considering whether [the accused's] confession was voluntary." *Id.* at 454, 825 A.2d at 1107. Because the suppression court had considered only the time that the accused spent with the interrogating officer, and had not given any weight to the total time spent in custody in Maryland, the judgment of conviction was reversed, and the case was remanded for a new trial. *Id.*

*Hiligh v. State,* 375 Md. 456, 825 A.2d 1108, was authored for the Court of Appeals by Judge Wilner, who had written for the Court in *Williams.* *Hiligh* was a post-conviction case in

which the discussion of delayed presentment was addressed in the context of the adequacy of trial counsel's representation. Hiligh had been arrested at about 11:00 p.m. on March 20, 1995, for armed robbery. By 3:30 a.m. on March 21 the charging documents were completed to process Hiligh for that crime. Interrogation of Hiligh regarding Prince George's County robberies began at 8:35 a.m. on March 21 and continued until approximately 6:00 p.m. During that period a series of statements were taken from him, only the first of which was the subject of the reported case. Hiligh was then interrogated by officers from Anne Arundel and Howard Counties concerning robberies in those jurisdictions. It was not until 10:30 p.m. on March 21, some twenty-three and one-half hours after he was first brought to the police station, that he was taken before a Commissioner.

The *Hiligh* Court described its decision in *Williams* as concluding that "when a delay in presentment was not only unnecessary but deliberate and for the sole purpose of extracting incriminating statements, it must be given special weight by a suppression court." 375 Md. at 472, 825 A.2d at 1117. Inasmuch as "the police had all of the information and had completed all of the administrative paperwork necessary to present [Hiligh] to a District Court Commissioner by 3:30 a.m. on March 21, at the latest," the Court held that "[a]ll delay after that point, as a matter of both law and fact, was unnecessary." *Id.* at 473, 825 A.2d at 1118. The Court further found it beyond dispute "that the delay was deliberate and was for the sole purpose of extracting incriminating statements from [Hiligh]." *Id.* at 473–74, 825 A.2d at 1118. Under those circumstances the suppression court at Hiligh's original prosecution would have been required, had defense counsel so argued, "to give that delay very heavy weight and examine whether the State had shouldered its heavy burden of proving that the confession was not induced by that coercion." *Id.* at 474, 825 A.2d at 1118. The order of the circuit court in the post-conviction proceedings granting Hiligh a new trial was affirmed.

■ We conclude that the *Williams* trilogy of cases is based upon the following general concepts. First, because the concern is with delay in presentment that affects the voluntariness of a statement given during custodial interrogation, a delay that can have no effect on the voluntariness of a statement is immaterial to suppression. That concept is illustrated in the subject case, as we explain, *infra.*

■■ Second, some delays are necessary. These present no violation of Rule 4–212(e) or (f) and do not weigh in any degree against voluntariness in the suppression court's evaluation process. In *Williams,* the Court "gave examples of situations in which a delay *would* be regarded as necessary[,]" by quoting from *Johnson v. State, supra,* and saying:

" '(1) [T]o carry out reasonable routine administrative procedures such as recording, fingerprinting and photographing; (2) to determine whether a charging document should be issued accusing the arrestee of a crime; (3) to verify the commission of the crimes specified in the charging document; (4) to obtain information likely to be a significant aid in averting harm to persons or loss to property of substantial value; (5) to obtain relevant nontestimonial information likely to be significant in discovering the identity or location of other persons who may be associated with the arrestee in the commission of the offense for which he was apprehended, or in preventing the loss, alteration or destruction of evidence relating to such crime.' "

*Williams,* 375 Md. at 420, 825 A.2d at 1087 (quoting *Johnson,* 282 Md. at 329, 384 A.2d at 717).[5]

■ Third, there may be delays which are unnecessary, and thereby violative of Rule 4–212(e) and (f), but which are not

---

**5.** The above list is necessarily nonexclusive. In *Williams,* the defendant was taken to a hospital for medical treatment after the arrest and before he arrived at the police station. See *Williams,* 375 Md. at 423, 825 A.2d at 1089. Further, the arrestee may be too intoxicated to present or to interrogate. *See, e.g., United States v. Christopher,* 956 F.2d 536, 539 (6th Cir.1991), *cert. denied,* 505 U.S. 1207, 112 S.Ct. 2999, 120 L.Ed.2d 875 (1992). Other examples may be found in 1 Wright, *Federal Practice and Procedure: Criminal* § 74 (3d ed.1999, 2003 Cum.Supp.).

for the sole purpose of custodial interrogation. These delays must be weighed against voluntariness, but they do not require "very heavy" weight against voluntariness in that evaluation. Our analysis in the instant matter calls these delays "Class I."

■ Fourth, there are unnecessary delays, violative of Rule 4–212(e) and (f), which are deliberately for the sole purpose of custodial interrogation. Our analysis refers to this type of unnecessary delay as "Class II." A suppression court is required to weigh a Class II delay "very heavily" against voluntariness in its evaluation of a resulting statement's admissibility.

■ Fifth, although subjecting the arrestee to actual interrogation is the best evidence that that part of a delay in presentment is for the sole purpose of custodial interrogation, a delay, depending on the facts, may be for the sole purpose of custodial interrogation, although unaccompanied by actual interrogation. *See Hiligh v. State,* 375 Md. at 473–74, 825 A.2d at 1118 (including within a delay described as one "for the sole purpose of extracting incriminating statements" the period on March 21, 1995, between 3:30 a.m., when charging document was prepared, and 8:35 a.m., when custodial interrogation commenced concerning crime that was the subject of the charging document).

■ We now turn to a consideration of the facts of the instant matter in light of these concepts.

The thirty and one-half hour delay between Odum's arrival at the police station and his presentation before a Commissioner can be divided into five periods.[6] The first is from 11:37 a.m. on June 26, 2001, to 5:40 p.m. that day while Odum was confined in the interview room, alone, until Corporal Smith arrived from the courthouse in Marlboro. Depending on the facts developed on remand, this delay may or may not

---

**6.** We begin our analysis with Odum's arrival at the police station because Odum's transportation from the point of arrest to the police station is obviously a necessary delay.

be necessary. We do not know from the present record whether or, if so, when the probable cause underlying the arrest warrant was determined to justify proceeding with a prosecution for robbery. Further, Odum was not interviewed during this delay, and its purpose was not solely a contemporaneous attempt to extract incriminating statements. A finder of fact could conclude that the purpose of this delay was to allow the officer who had investigated the armed robbery to perform his duties at the county courthouse. Whether this delay requires no weight, or is a Class I or Class II delay, will depend on the facts developed on remand.

The second period of delay is the three and one-half hours next following Corporal Smith's return to the police station. About one hour and thirty-five minutes, cumulatively over four intervals, of this second period of delay involved police officers in the interview room with Odum. In the first half hour Odum was furnished coffee and cigarettes and told of the reason for his arrest, but he was not even Mirandized. After a five minute break, when Corporal Smith apparently was getting a camera, Odum was photographed and given a cigarette between 6:15 and 6:30 p.m. In five minutes around 6:52 p.m. Odum signed his first *Miranda* waiver. In the forty minutes ending at 9:10 p.m. Odum's boots were photographed, and he was asked about any alibi for the liquor store robbery.

In *Williams*, the defendant, when brought to the police station, was questioned about two robberies for which he had been arrested. That interrogation proceeded continuously from 9:25 a.m. until 12:42 p.m. during which Williams gave an oral statement as to each of the two robberies, and each of those oral statements was reduced to writing. The Court of Appeals said that "[i]t was entirely appropriate at that point for the police to engage in preliminary questioning, to get some basic information about their suspect and even about his involvement in the two robberies, so that he could be properly identified and charged." *Williams*, 375 Md. at 423, 825 A.2d at 1089. Further, the Court said that "[i]t was not then inappropriate for the police to seek a written statement [from

Williams], to confirm the oral admissions, which they also did promptly." *Id.*

To the extent that the police in the instant matter were trying to get some information from Odum about the armed robbery for which he was being held, the questioning is analogous to the preliminary questioning of Williams, which the Court of Appeals held was appropriate and not an unnecessary delay in violation of the Rule. This case is stronger at the initial interview stage for voluntariness than *Williams,* however, because in the latter case the questioning produced written statements concerning the robberies, whereas in the instant matter Odum was not intensively questioned, gave no statement, and his will obviously was not overborne. Under the evidence, the finder of fact, on remand, could view the second period of delay as necessary, so that no weight need be given to it, or as Class I, so that "very heavy weight" evaluation would not be triggered.

The third period of delay is the next three hours and fifty minutes, from 9:10 p.m. on June 26 to 1:00 a.m. on June 27, during which Odum was confined, alone and uninterruptedly, in the interview room. The State presented no evidence directly attempting to justify the failure during that three hours and fifty minutes to take Odum before a Commissioner for the presentation of the armed robbery charge on which he then was being held under an arrest warrant. Prior to this third period of the confinement, the State apparently had obtained from Odum either all of the information that Odum was willing to give concerning the robbery, or that the State was interested in getting from Odum at that time. Because we do not know, on the present record, what else may have been happening in the station house during this delay, it cannot be determined if this delay was necessary, or Class I or Class II.

The fourth period of delay began at 1:00 a.m. and extended until 4:00 a.m. on June 27. During that period Odum was interrogated concerning the murders, resulting in an oral statement which was reduced to writing during the last two

hours of this period of the confinement. We cannot say that, as a matter of law, "very heavy weight" evaluation was triggered by the fourth period of delay. In *Perez v. State, supra,* 155 Md.App. 1, 841 A.2d 372, this Court, sitting *en banc,* considered the application of the *Williams* trilogy to a case tried prior to those decisions in which "very heavy weight" evaluation was not shown by the record to have been employed. It was concluded that "there may be factual situations where the heavy weight standard does apply as a matter of law as well as fact, but this determination should be made by the suppression court, after a new hearing, as part of its consideration of the totality of the circumstances." *Id.* at 28, 841 A.2d at 387.

The case before us exemplifies the need for first level fact-findings by the trial court, particularly with respect to the reasons for the fourth period of delay. The present record strongly suggests that by the late night of June 26 and the early morning of June 27, the interest of the police in Odum changed focus from the liquor store robbery to the kidnappings and murders of Patten and Brown. It is clear that the police had brought to the station house a number of subjects from the Fort Washington neighborhood where Odum resided and that those individuals were being questioned about the Patten and Brown crimes.

At this phase in the analysis, the case before us differs from *Williams* in several respects. There was a warrant for murder outstanding against Williams, so that, even if he had been released on bail by the Commissioner, when presented on the robbery charges, he could have been arrested immediately and brought back to the station for questioning about the murder. *Williams,* 375 Md. at 423–24 n. 2, 825 A.2d at 1089 n. 2. Here, had Odum been released on bail, there was no back-up warrant, and a possible perpetrator or material witness could have been lost. In *Williams* it did "not appear that the police were focusing on the identity or location of other persons" and there was "no concern about possible harm to other people[.]" *Id.* at 424, 825 A.2d at 1089. Here, it appears that at least four persons, other than Odum, were being questioned about the

Patten and Brown crimes, but the record does not show whether, prior to the fourth delay, the police had enough information to charge Odum with kidnapping and murder.

Consistent with *Williams* and *Perez,* the suppression court, on remand in the instant matter, should determine, *inter alia,* whether the fourth period of delay in this case was necessary. Based on information received from other subjects who were in custody that evening, the police, in interrogating Odum, may have been trying " 'to determine whether a charging document should be issued accusing [Odum] of a crime' " separate from the liquor store robbery. *Williams,* 375 Md. at 420, 825 A.2d at 1087 (quoting *Johnson,* 282 Md. at 329, 384 A.2d at 717). Phrased another way, although the delay may have been unnecessary in relation to presentment for the liquor store robbery, additional information obtained by the police about the kidnappings and murders may have made further delay necessary in order to determine if charges should be brought against Odum for those crimes. See *Williams,* 375 Md. at 423, 825 A.2d at 1089. In addition, the present *suppression* record does not tell us whether the possessors of the murder weapons were in custody, or whether those weapons had been recovered by the time the fourth period of delay in Odum's presentment had begun or concluded.[7] Indeed, the police also may have been trying to sort out which, if any, of the subjects in custody may not have been involved.

If, on the other hand, the suppression court, on remand, concludes that the fourth period of delay was unnecessary, and was for the sole purpose of obtaining self-incriminating statements, very heavy weight must be given to this delay in evaluating the voluntariness of Odum's written statement. If the trial court, in its review, decides that Odum's statement is voluntary, but that the evidence, or inferences therefrom, are conflicting as to whether a period of delay is unnecessary and for the sole purpose of attempting to elicit incriminating

---

7. But see Part III, *infra,* as to the trial record.

statements, the court will instruct the jury that, if it so finds, the jury shall give very heavy weight against voluntariness to such period or periods of delay.

 Odum did not appear before a Commissioner for another fourteen hours and twelve minutes following the completion of his written statement. This is the fifth period of delay. In order for a statement to be suppressed for lack of voluntariness, based in whole or in part upon delay in present-ment, the statement must *result* from the delay. *See Williams,* 375 Md. at 434, 825 A.2d at 1095. Odum's written statement did not result from this fifth period of delay because the written statement already had been given. Further, Odum's photo identification of Hollingsworth at 10:57 a.m. on June 27 merely confirmed Odum's earlier statement implicat-ing Hollingsworth and resulted, not from the fifth period of delay, but from the written statement obtained during the fourth period of delay.

In his supplemental memorandum to this Court, and at reargument, Odum submitted that this Court should not re-mand and should order that the statements be suppressed. That is not the result of the mandates in the *Williams* trilogy, and it is not consistent with *Perez,* or with decisions of the Court of Appeals relied on in *Perez.*

In *Lodowski v. State,* 307 Md. 233, 513 A.2d 299, *cert. denied,* 475 U.S. 1086, 106 S.Ct. 1469, 89 L.Ed.2d 725 (1986), the record did not enable the Court of Appeals to determine whether three statements of the defendant met the test of voluntariness, because the suppression court had not made necessary fact-findings. The State proposed that the trial court make the necessary findings on the then present record, or, if a new suppression hearing were held and resulted in a ruling denying suppression, that the judgment of conviction resulting from the original trial be affirmed. *Id.* at 256, 513 A.2d at 311–12. The Court of Appeals rejected both sugges-tions. As explained in *Gill v. State,* 265 Md. 350, 357, 289 A.2d 575, 579 (1972), the voluntariness of a statement by an accused is an integral part of the trial itself. Thus, "the defendant is

entitled not only to a new [suppression] hearing but also to a new trial." *Lodowski,* 307 Md. at 256, 513 A.2d at 312.

 Also relevant is the prosecution of Gregory Mung Sen Tu. In an unreported opinion on the appeal from the first prosecution (*Tu I* ), this Court reversed the judgment of conviction and remanded for a new trial. *See Tu v. State,* 97 Md.App. 486, 489, 631 A.2d 110, 111 (1993), *aff'd,* 336 Md. 406, 648 A.2d 993 (1994) (*Tu II* ) (describing mandate in unreported *Tu I* ). The ground for reversal in *Tu I* was that items seized from the accused's hotel room were not described in a search warrant and were not in plain view. At a second suppression hearing following the remand, the State proved that almost all of the items previously excluded had not been in the hotel room but had been in police custody as a result of Tu's arrest prior to the issuance of the search warrant. This Court, in *Tu II,* affirmed the use of this evidence at the new trial. On certiorari review the Court of Appeals affirmed this Court, holding that, under the law of the case doctrine, as applied to the mandate in *Tu I,* the evidence at the second suppression hearing was materially different from that at the first hearing and was properly admitted on remand. *Tu v. State,* 336 Md. 406, 648 A.2d 993 (1994). For present purposes it is sufficient to note that the Court of Appeals' holding stands for the proposition that the State may offer additional evidence at a new suppression hearing following a reversal and remand for a new trial based on error in the original suppression hearing.

The exception to the foregoing rule applies when the State has failed to litigate and prove an issue at the initial suppression hearing. *See Southern v. State,* 371 Md. 93, 807 A.2d 13 (2002). In *Southern,* the accused challenged his warrantless stop by the police and sought suppression of the fruits of that stop. He was unsuccessful at the suppression hearing. The Court of Appeals held, on an appeal that included review of the suppression hearing, that the stop was unlawful. That Court denied the State the opportunity to demonstrate the constitutionality of the stop at a new suppression hearing, as

part of the mandated remand for a new trial. This was because, although the issue had been adequately raised, the State had failed to put in any evidence as to the constitutionality of the stop at the original suppression hearing. Thus, the State had failed to meet its burden of establishing the constitutionality of the detention. In connection with its discussion of *Tu*, the Court of Appeals said:

> "At a new trial, a defendant may always file a new motion to suppress, and if the State opposes it, a defendant, in appropriate circumstances may avail himself of 'law of the case' principles. *Otherwise, it is a new motion, new hearing, new trial, and new decision.*"

*Southern*, 371 Md. at 110, 807 A.2d at 23 (italics in original eliminated; emphasis added).

Here, the State litigated the voluntariness issue. Without reiterating all of the evidence described above, we hold that the State presented sufficient evidence at Odum's original suppression hearing from which the trier of fact could find voluntariness. Thus, the suppression hearing following our remand, like the new trial itself, will be *de novo*.

### III. Admissibility of Handgun

 Because the third issue raised by Odum might recur on retrial, we exercise our discretion to address it for guidance.

Introduced at trial as a State exhibit was a .40 caliber, Smith and Wesson, Ruger semiautomatic handgun. A 9 millimeter bullet fired from the Ruger matched a 9 millimeter bullet taken from Brown's body. The State undertook to connect the Ruger to Carroll, but Odum argues that the weapon was inadmissible for lack of authentication through a chain of custody.

Andre Green (Green) of Oxon Hill had grown up with Carroll in the neighborhood and had known Carroll for eight years. On June 3, 2001, Green purchased the Ruger for $500 at a festival held at Good Hope Road and Martin Luther King Jr. Avenue in southeast Washington, D.C. On June 3 or 4

Green sold and delivered the Ruger to Carroll, at Green's house, in consideration of a $100 payment and Carroll's promise to pay the balance of $400. By late June Carroll had not paid Green the outstanding balance. Green went to Carroll's house and obtained the Ruger back from Carroll. Green then again went to Martin Luther King Jr. Avenue in southeast Washington where he sold the Ruger to an African–American male, 5′8″–5′9″ in height, who was known to Green only as Black. Black paid $500, from which Green returned $100 to Carroll.

On July 3, 2001, Green, accompanied by his attorney, Robbyn McIntosh (McIntosh), surrendered himself on an outstanding warrant to Detective Greg Coletrane (Coletrane) of the Prince George's County police. This led to Green's attempting to recover the Ruger from Black. Because Green was in custody, he instructed McIntosh how to attempt the recovery. McIntosh made inquiries "on the street" which resulted in the return of the Ruger through a drop arrangement under which she never saw Black. McIntosh placed the money to repurchase the Ruger in a baseball cap at a particular location on the District of Columbia side of the parking lot behind the Oxon Hill police station and, when she returned to the drop site, the Ruger was in the baseball cap. McIntosh delivered the weapon to Coletrane who turned it over to the Evidence Unit for firearms inspection. Green, McIntosh, Coletrane, and a ballistics examiner testified to the facts set forth above.[8]

Specifying a want of authenticity, Odum objected to receipt of the Ruger in evidence. The court overruled the objection, saying:

"The weapon was identified by Mr. Green. Weapon was identified by Ms. McIntosh as the one she secured. The weapon was identified by the Detective who received it from Ms. McIntosh.

---

8. The .40 caliber Ruger could fire a 9 millimeter bullet, but it would not automatically eject the casing.

. . . .

"... Mr. Green testified that he sold that weapon to Cortez Carroll; so, not only is there a connect to it, but it's been identified in connection with this particular case; so, for all those reasons, your motion to object is overruled."

Under Maryland Rule 5–901(a), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The evidence described above was sufficient to support the trial court's threshold determination of authenticity. Thereafter, the credibility of the witnesses was for the jury to decide.

## IV. & V.

Because, on remand, Odum may be prosecuted only for kidnapping, the resolution of the fourth issue raised by Odum, concerning the admissibility of autopsy photographs in the context of the original trial, would not be useful as guidance. Nor would issue five likely recur, concerning a portion of the rebuttal phase of the State's final argument. Consequently, we do not address the last two issues.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY VACATED AND CASE REMANDED FOR A NEW TRIAL, AS DESCRIBED HEREIN.**

**COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY, MARYLAND.**